STATE OF UTAH, ex rel., UTAH SAVINGS AND
TRUST COMPANY, a Corporation, Plaintiff, v.
SALT LAKE CITY, a Municipal Corporation, JOHN
S. BRANSFORD, Mayor of Salt Lake City, J. B.
MORETON, City Recorder of Salt Lake City, and
GIDEON SNYDER, City Treasurer of Salt Lake City,
Defendants.

No. 1992. Decided December 30, 1908 (99 Pac. 255).

1. ELECTIONS—ORDERING ELECTION—NOTICE. The statutory notice of a
special election is a matter of substance, and, unless there is a
substantial compliance with·the statute, the election will ordi-
narily be held invalid. (Page 34.)

2. ELECTIONS—ORDERING ELECTION—NOTICE. The statutory notice of
election performs the function of giving constructive notice to
the voter, binding on him, whether he has actual notice or not,
and of imparting actual notice to him so that he may participate
in the election, and, to be binding constructive notice, the stat-
ute must be complied with, to the exent at least that it may
fairly and reasonably be said that the purpose thereof has
been carried into effect, and this may sometimes be done with-
out a literal compliance with it. (Page 34.)

3. MUNICIPAL CORPORATIONS—ISSUE OF BONDS—SUBMISSION TO VOTE
—ELECTION NOTICE. The notice of election authorized by Comp.
Laws 1907, sections 308-310, authorizing elections in cities to
determine the question of the issuance of bonds for water sup-
ply, light, or sewers, and providing that notice of election shall
be given by·publication in newspapers for a specified time, is
jurisdictional, and, without the notice which is the official call for
the election, no election can be legally held. (Page 35.)

4. MUNICIPAL CORPORATIONS—ISSUE OF BONDS—SUBMISSION TO VOTE
—NOTICE OF ELECTION. A notice of a special election in a city
on the question of issuing bonds for water supply and sewers,
which gave the date of the election and which stated the place
as the city, and which declared that the election should be con-
ducted according to the laws of the state, was published in news-
papers for the time prescribed by Comp. Laws 1907, section 309.
The polling places were designated by the council, as required by
section 890, and the notice required by section 792, providing
that each registry agent shall post notices of election within

his district, stating the date and place of election and the hours during which the polls will remain open, was posted for the time required. *Held*, that the notice of the election complied with the statute. (Page 37.)

5. ELECTIONS—NOTICE—SUFFICIENCY. An election is not illegal merely because the proclamation required by Comp. Laws 1907, section 783, requiring the Governor to issue an election proclamation, does not designate the particular polling places at which the voters may express their will, though such proclamation is the official call for the election. (Page 35.)

6. MUNICIPAL CORPORATIONS—ISSUANCE OF BONDS—ELECTIONS—VALIDITY. Under Comp. Laws 1907, sections 308-310, authorizing elections in any city to determine the question of issuing bonds for water supply, sewers, etc., and requiring the council to annually levy a tax to pay the interest on the bonds as it falls due, and to create a sinking fund for their payment, the validity of the bonds of a city for water supply and sewers, authorized at a special election held for the purpose, is not affected by the fact that the ordinance providing for the election declared that the net revenue from the water system should be set apart for a sinking fund for the payment of the bonds, since such statement was not a misrepresentation, as the taxpayers were chargeable with notice of the powers conferred on the council. (Page 39.)

7. MUNICIPAL CORPORATIONS—ISSUANCE OF BONDS—ELECTIONS—VALIDITY. The fact that an ordinance providing for an election in a city to determine the question of the issuance of bonds for a water supply and sewers declared that the net revenue from the water system should be set apart for a sinking fund for the payment of the bonds, while Comp. Laws 1907, section 310, expressly provides that the city council shall annually levy a tax to pay the interest and to provide a sinking fund for the payment of the bonds, did not affect the validity of the bonds authorized, for the erroneous statement in the ordinance was, at most, an irregularity which did not affect the validity of the election in the absence of a showing that any of the voters were, in fact, induced by reason of such improper statement in the ordinance to vote for bonds. (Page 42.)

Original proceeding by the State, on the relation of the Utah Savings & Trust Company, against Salt Lake City and others, for a writ of prohibition to prohibit the defendants from issuing, negotiating, and disposing of water and sewer bonds.

WRIT DENIED.

*Messrs. Richards, Richards & Ferry* for plaintiff.

*Messrs. H. J. Dininny* and *P. J. Daly* for defendants.

### PLAINTIFF'S AUTHORITIES.

The notice of election should have designated the polling places. (Compiled Laws of Utah 1907, sec. 309; 29 Cyc. 1590, and cases cited; 21 Am. & Eng. Ency. of Law, 47-48; *Hanswirth v. Mueller et al.* [Montana], 64 Pac. 324.) The notice should not have stated that the net revenues from the water system would be a sinking fund for the payment of the bonds and interest. (Compiled Laws of Utah 1907, sec. 310; *Skinner v. City of Santa Rosa* [Cal.], 40 Pac. 742.)

### DEFENDANTS' AUTHORITIES.

The position we have taken that it was not necessary to the validity of this bond election that the polling places should be designated in the published notice of election, is sustained by the case of *Packwood v. Kittitas Co.,* 15 Wash. 88, 45 Pac. 640. An election will not be set aside because the law requiring the giving of notice has not been strictly followed, if such notice was given, as that the great body of electors was informed of the time, place and purpose of the election. (*Cone v. Smith,* 132 Mass. 289; *Welsh v. Wetzell,* 29 W. Va. 63; *Seymour v. Tacoma,* 6 Wash. 427, 33 Pac. 1059; *Woodward v. Fruitable, etc.,* 99 Cal. 554; *In re Mitchell,* 81 Hun 401; *State v. Carroll,* 17 R. I. 591; *Williams v. Shondy,* 12 Wash. 362, 41 Pac. 169; *Dishon v. Smith,* 10 Ia. 212; *State v. Doherty,* 47 Pac. 959; *Sommercamp v. Kelly,* 71 Pac. 150; Dillon on Mun. Corp., sec. 197, note 3, and cases cited; *Lodgord v. East Grand Forks* [Minn.], 117 N. W. 341; *Town of Coloma v. Eaves,* 92 U. S. 484.)

"The vital and essential question in all cases is whether the want of statutory notice has resulted in depriving sufficient of the electors of the opportunity to exercise their franchise to change the result of the election." (*Wheat v. Smith* [Ark.], 7 S. W. 61; McCrary on Elections, 143; Cooley's Const. Lim., p. 88; *Dishon v. Smith*, 10 Ia. 212; *State v. Grey* [Nev.], 32 Pac. 190; *Railway v. Pickney*, 74 Ill. 277; *Com. v. Smith*, 133 Mass. 289; *State v. Jones*, 19 Ind. 356; *Sommercamp v. Kelly* [Idaho], 71 Pac. 147.

The sole purpose of the notice is to inform all interested parties in order that they may register and cast their ballots on the day fixed for the election. (*Cleveland v. City*, 54 S. C. 86, 31 S. E. 871; *Warsop v. Hastings*, 22 Minn. 438; *Clark v. City of Janesville*, 10 Wis. 141; *Seymour v. Tacoma*, 33 Pac. 1059; *Hesseltine v. Town of Wilbur*, [Wash.], 69 Pac. 1094; 1 Dillon on Mun. Corp., sec. 197, p. 280, note 3; *Williams v. Shondy* [Wash.], 41 Pac. 169; *Wiggins v. Lewiston* [Idaho], 69 Pac. 286; Tied. on Mun. Corp., sec. 65; *Territory v. Board* [Ariz.], 12 Pac. 730; *Dishon v. Smith*, 10 Ia. 117; *People v. Cork*, 14 Barb. 261; McCrary on Elections, secs. 142-149; *State v. Lansing* [Neb.], 64 N. W. 1104; Cooley Const. Lim., p. 759; *Trimmer v. Bomar*, 20 S. C. 354. See also *Cheyenne v. Rollins*, 96 Pac. 244; 1 Cook on Stock and Stockholders, p. 143; *Railway v. Commissioners*, 21 Kan. 309; *Railway v. Commissioners*, 116 N. C. 563; *Hamilton v. Village of Detroit* [Minn.], 85 N. W. 933; *People v. Sisson*, 98 Ill. 335.)

This statement that the bonds and interest would be paid out of the surplus water fund was surplusage, it being no part of the questions required to be submitted to the voters, and the notice of election being complete without it. (*Santa Barbara v. Davis*, 92 Pac. 308, 309 [Cal.], 1907; *Yesler v. Seattle*, 25 Pac. 1014, 1018 [Wash.].)

The authority to issue a municipal bond carries with it authority to levy sufficient taxes to pay the same, unless there is in the act itself, or in some general statute, a limita-

tion upon the power of taxation which repels such an interference. (*Loan Association v. Topeka,* 20 Wall 655, 660; *U. S. v. New Orleans,* 98 U. S. 381; *Wolf v. New Orleans,* 103 U. S. 358; *Ralls County v. U. S.,* 105 U. S. 733, 735, 736; *U. S. v. Clark,* 96 U. S. 211; *U. S. v. Fort Scott,* 99 U. S. 152; *U. S. v. Fort Scott,* 99 U. S. 152; *U. S. v. New Orleans,* 98 U. S. 381; See also 124 Fed. 124 and 115 Fed. 437.)

FRICK, J.

This is an application to this court for a writ of prohibition. For convenience the parties will be designated as plaintiff and defendants. The question involved being of a public nature, we have entertained the application without requiring the plaintiff to apply to the district court, as is usual with such applications.

The plaintiff, as a taxpayer of Salt Lake City, brings this action to prohibit the defendants from issuing, negotiating, and disposing of certain water and sewer bonds. The bonds in question are attempted to be issued and disposed of by virtue of the alleged authority conferred upon the defendants by a special election held on the 29th day of July, 1908, pursuant to an ordinance duly passed by the city council and approved by the mayor. The plaintiff, however, alleges that the special election was irregular with regard to the matter hereafter to be noticed, and that therefore the bonds should not issue. The ordinance was passed, and the election called and held, in conformity with the following constitutional and statutory provisions, namely: Section 3 of article 14 of the Constitution authorizes any county, city, town, village, or school district to incur an indebtedness beyond the current revenues in case a majority of the electors who have paid a property tax within the municipality the year preceding the election authorizes such indebtedness. Section 4 of the same article, within certain limits, authorizes an indebtedness to be incurred as provided in section 3 for water supply, artificial lights, and sewers when the plants are

owned and controlled by the municipality incurring the indebtedness. Pursuant to the foregoing constitutional provisions, the Legislature passed a certain act which now constitutes sections 308, 309, and 310, Comp. Laws 1907. Section 308, in substance, provides that any city or town may incur an indebtedness not exceeding four per cent of the value of the taxable property therein for water supply, artificial light, or sewers when the works are owned and controlled by the city or town, after the question shall have been submitted to the qualified electors who have paid a property tax in the year preceding the election, and if a majority of the electors voting upon the proposition shall have voted in favor of incurring the debt. Section 309 is as follows:

"When the city council of any city or board of trustees of any town shall have decided to submit the question of incurring a bonded indebtedness, it shall, by order, specify the particular purpose for which the indebtedness is to be created and the amount of bonds which it is proposed to issue, and shall further provide for submitting the question of the issue of such bonds to the qualified electors of the city or town at the next general election, or at a special election to be called for that purpose by the council or the board, as the case may be. If the question is submitted at a special election, it shall be held, except as herein otherwise provided, as nearly as possible in conformity with the general election laws of the state. Notice shall be given of such election by publication in some newspaper or newspapers published in the city or town for four weeks prior thereto; or, if there be no newspapers, then by posting notices. The council or the board, as the case may be, shall cause ballots to be printed and furnished to the qualified electors, which shall read: 'For the issue of bonds: Yes. No.' If a majority of the qualified electors voting thereon shall have voted in favor of incurring such indebtedness, the board may proceed to issue the amount of bonds specified."

Section 310, in substance, provides that the city council shall, by ordinance, provide for the issuance and disposal of the bonds; that the same shall not be sold below par; and that such council shall annually levy a sufficient tax to pay the interest as it falls due, and also to constitute a sinking fund for the payment of the principal within twenty years from the date of the bonds.

Pursuant to these provisions, the city council of Salt Lake City duly passed an ordinance, which was approved by the mayor, in which it was provided that propositions for the issuance of bonds in the sum of $475,000 for water supply, and in the sum of $125,000 for sewer, be submitted separately to the voters in said city at a special election. The ordinance contained a somewhat detailed statement with regard to the necessity of issuing the bonds and the purposes to which the proceeds derived therefrom should be applied. The ordinance also provided for a special election and the giving of notice thereof, as provided in section 309, *supra*. The ordinance also contained a statement that the election was called pursuant to the sections above referred to. Agreeable to such ordinance, a notice was prepared in which were recited about all the statements contained in the ordinance, including the particular purpose for which the bonds were to be issued. The notice was published for the time required by section 309, *supra,* and, while it gave the date of the election, it stated the place where it was to be held as Salt Lake City, without specifying the particular polling places where the voters of the several voting districts were to cast their ballots. The notice also contained a statement that the "election shall be conducted according to the statutes and laws of Utah, and shall be held in manner and form provided thereby." On the 23d day of July, 1908, the city council, having previously arranged for polling places, duly designated such places in each election district, comprising forty-one districts in the whole city, and announced such places and caused five notices to be posted in each election district, amounting to 205 notices for the entire city. These notices were as follows:

"NOTICE OF BOND ELECTION.

A special election will be held in Salt Lake City, Salt Lake county, State of Utah, on Wednesday, July 29th, 1908, at which election the qualified electors of Salt Lake City who shall have paid a property tax in the year preceding the election, may vote upon the question of the city incurring a bonded indebtedness to the amount of $600,000.00, as follows:

$475,000.00 for city water and waterworks purposes; and $125,000.00 for city sewer purposes.

Persons qualified to vote and residing within the following districts, to-wit, Nos.............. in the ............ Municipal Ward as the said districts existed at the time of the municipal election in 1907, will vote at ......................

Polls will open at 7 o'clock a. m. and close at 7 o'clock p. m.

J. B. MORETON, City Recorder."

The blanks, as shown above, were filled by giving the ward and the particular places in each district where the electors should cast their ballots.

The propositions were submitted to the voters in the following form:

"WATER BONDS.

For the issue of bonds in the sum of $475,000.00 for city water and waterworks purposes."

"SEWER BONDS.

For the issue of bonds in the sum of $125,000.00 for city sewer purposes."

These questions were so placed upon the dial of the voting machines used in Salt Lake City at all elections that each voter, by simply moving a pointer to the right or left, could vote "yes" or "no" according to his choice. At the election 5,601 votes were cast upon the question for water supply, of which 3,030 were for, and 2,571 against, the issue of water bonds. Upon the second proposition there were 5,590 votes cast, 2,934 for, and 2,656 against, the sewer bonds. It will thus be seen that the proposition in favor of water bonds was carried by a majority of 459, while the sewer bonds were carried by a majority of 278.

The plaintiff contends that the bonds were not legally authorized, and therefore the defendant should be prohibited from issuing and disposing of them upon substantially the following grounds: (1) That a notice of the time and place of holding an election is an essential prerequisite to the holding of a valid election, and that no such notice was given in this instance; (2) because the ordinance authorizing and the original notice calling the election contained a

statement that the "net revenue from said water system shall
be set apart for and establish a sinking fund for the payment
of said bonds," while the statute (section 310) expressly
provides that the city council shall annually levy a sufficient
tax to pay the interest and to provide a sinking fund for
said purpose. The notice, as published, it is contended, was
misleading, and misled the voters in the foregoing particu-
lars, by reason of which the election is illegal and the bonds
not authorized. These are the only objections that are
raised, and we will now proceed to consider them in the or-
der in which we have stated them above.

First, as to the sufficiency of the notice. Upon this ques-
tion the courts are not in entire accord. There are a few
decisions which hold that the statute providing for notice
of an election must be strictly complied with; or the elec-
tion held thereunder will be void. Other courts hold that
such statutes are directory merely, and in case it is made
to appear that the voters had actual notice of the election,
or that they attended the polls and participated in the elec-
tion in such numbers as important elections are usually at-
tended by the voters, the election will be held valid, unless
it be made to appear affirmatively that voters in sufficient
numbers remained away from the polls for want of a proper
notice to change the result of the election. We think, how-
ever, that the weight of authority is to the effect that a no-
tice of the time and place of the election ordinarily is essen-
tial, and that the statute prescribing a notice must be sub-
stantially complied with in order to hold a valid election.
A discussion of the foregoing propositions will be found in
the following cases: *Packwood v. Kititas County,* 15 Wash.
88, 45 Pac. 640, 33 L. R. A. 673, 55 Am. St. Rep. 875;
*Seymour v. Tacoma,* 6 Wash. 429, 33 Pac. 1059; *Williams
v. Shoudy,* 12 Wash. 362, 41 Pac. 169; *Dishon v. Smith,*
10 Iowa 212; *City of Cheyenne v. State* [Wyo.], 96 Pac.
244; *Hamilton v. Village of Detroit,* 83 Minn. 119, 85 N.
W. 933; *State v. Carroll,* 17 R. I. 591, 24 Atl. 835.

In the last case cited, the Supreme Court of Rhode Island collates and reviews the authorities upon this question. It is there said that there is a difference in this regard between a general election where the time of holding it is fixed by statute, and a special election where the time is not so fixed, but is designated and is found only in the notice calling the election. This doctrine is certainly grounded on some good reason. Again, it is often said that the notice calling an election is for the sole purpose of apprising the voter that an election will be held, and the matters, in a general way, upon which he may express his choice, and if the voter is apprised of these things, and there is an attendance at and participation in the particular election by the voters generally, or in such proportion as is usual on important elections, then it devolves upon the party attacking the election to show that a merely defective notice actually affected the result of the election. This rule is based upon the theory that where the people have actually expressed themselves at the polls the courts are strongly inclined to uphold rather than to defeat the popular will. (1 Dillon, Mun. Cor., Section 117.) It is also frequently said that notice of the time and place of holding an election is of the substance, and a failure to comply with the law in that particular is not generally to be treated as a mere irregularity. (Cooley, Const. Lim. (7th Ed.), p. 930; 1 Dillon, Mun. Cor., Section 117.) We are rather impressed with the doctrine that, at least so far as concerns special **1, 2** elections, the notice is a matter of substance, and that unless there is a substantial compliance with the statute in this regard the election ordinarily cannot be held valid. Upon the question involved it should not be overlooked that the statutory notice performs a double function: (1) As giving constructive notice to the voter binding upon him whether he has actual notice or not; and (2) to impart actual notice to him so that he may participate in the election. In order, therefore, to be binding constructive notice, the statute should be complied with, to the extent, at least, that

it may fairly and reasonably be said that the purpose thereof has been carried into effect. This sometimes may be done without a literal compliance with the statute. We are of the opinion that in this case there has been a substantial, if not a literal, compliance with the statute for the following reasons: It will be observed that section 309, *supra,* only requires that a "notice shall be given of such election by publication in some newspaper or newspapers published in the city." This notice must be published for four weeks prior to the election. This notice no doubt is jurisdictional; that is, without this notice, which constitutes an official call for the election, no election can legally be held. Nor can there be any doubt that this notice must state the time and the place where the election is to take place. This, it seems to us, is all that was contemplated to be stated in the notice provided for by section 309, *supra.* The particular place where the voter is to cast his ballot is not referred to, but the section does, in terms, provide that the election "shall be held, except as herein otherwise provided, as nearly as possible in conformity with the general election laws of the state." By referring to the laws governing general elections it will be observed that by section 783 general elections are called by the Governor's proclamation, which must be issued at least sixty days before a general and not less than ten days before a special election, and in which the time of the election and the offices to be filled must be stated. This proclamation constitutes the official call for the election, and in case of a special election is the only method by which a legal election can be called and held. The election, however, does not fail, nor is it illegal, simply because the particular polling places at which the voters may express their will are not designated in the call for the election. This would be so in any case, we think, unless the statute specially provides therefor. There are other sections of the statute that provide how and when the particular polling places shall be designated and announced to the voters, and re-

course must be had to these statutes for the purpose of determining these matters. By subdivision 2 of section 511, it is made the duty of the county commissioners to establish election districts, and by section 845 it is made their duty to designate the polling places in each district. Further, in section 792, it is provided that notices shall be posted in each election district "in at least five conspicuous places within the same, stating the time and place of election, and the hours during which the polls will remain open." These provisions apply to general elections. In section 890 it is, however, provided that for municipal elections the city council shall designate the voting places, and that all municipal elections shall be conducted in accordance with the general laws of the State, and that the notices shall be posted as provided in section 792. Sections 792 and 890 are the only ones which refer to how and when the notices which designate the polling places shall be posted. In this regard section 890, in effect, refers to section 792, inasmuch that by section 890 it is simply provided that notices shall be posted as required by the general election laws.

It is clear, therefore, that if the question of issuing bonds had been submitted to the voters at the general election held on November 3, 1908, as it might have been under section 309, *supra,* the county commissioners and not the city council would have designated the polling places in the several wards and polling districts of the city. In construing sections 792 and 890 together, it will be seen that, if the notices stating the polling places are posted in each of the voting districts for at least five days prior to an election, the law has been complied with. In none of the sections, and we know of no others that have been referred to, is the time fixed at which either the county commissioners or the city council shall designate the polling places, except by implication; that is, that such places must be designated at least more than five days before the election, since the notice in which the polling places are to be stated must be posted at least five days before the election. Section 890 requires that

all municipal elections, and this includes special as well as general elections, shall be conducted according to the general laws of this State, and that the notice required at a general election shall be posted in the same manner for a municipal election. We are of the opinion, therefore, that it was not contemplated that the notice referred to in section 309 should state the particular polling places in the several districts at which the voters should cast their ballots. We think that it was intended that the polling places should be designated in the usual manner as for general elections, and that the notice referred to in sections 792 and 890 should be posted in the manner and for the time therein specified, and that, if this is done, the election is held according to law so far as the publishing and posting of the notice is concerned. It is conceded by plaintiff that the original notice calling the election was published for the time required by section 309, that the polling places were designated by the city council as required by section 890, and that the notice required by section 792 was duly posted for the time and in the manner as therein provided. The objection, therefore, that the city council did not comply with the statute with respect to the giving of the statutory notice of election cannot be sustained, but, upon the contrary, we think that the statute in this regard if not literally, nevertheless was substantially, complied with, and that the election was legally called and held. The first objection must, therefore, be overruled.

The second objection, in our judgment, is not one that affects the authority of the city council to issue and dispose of the bonds in question. The contention that the voters were misled by the statement contained in the published notice, to the effect that the interest and principal of the contemplated water bonds would be paid out of the revenues obtained from the water system of Salt Lake City, is not tenable. The city can issue bonds only when authorized by statute. The purposes for which it may do so, the amount thereof, and the manner in which they may be issued, are

all provided for by statute. Before issuing bonds for the purposes for which the bonds in question were contemplated, the authority to do so had to be obtained from the taxpayers. The means by which this authority is obtained is by an election at which the proposition is voted on. If a majority of the taxpayers authorize the issue of the bonds, they may be issued, otherwise not. But what is it that is submitted to the vote of the taxpayers? Upon this the statute speaks in plain and unmistakable terms. Nothing is submitted except the question as to whether the proposed bonds shall be issued for the purposes specified in the notice or not. If a majority of the taxpayers voting upon the proposition give their consent, then the bonds may be issued. The question, however, whether the bonds shall be paid by one method or another is not a question to be submitted to the voters. The same statute which requires the voters' consent to the creation of the debt, also provides how the debt shall be met in case it is authorized. While the taxpayer may withhold his consent to the creation of the indebtedness, he cannot express his choice with regard to the manner of its payment, nor upon the method by which the funds necessary therefor shall be obtained. This method is fixed by the statute, which provides that a tax shall be levied annually sufficient in amount to pay the interest and to create a sinking fund for the payment of the principal when it matures. Prudence requires that, when a public debt is created, adequate provision for its payment be made. The Legislature, in granting the power to municipalities to raise funds by the issuing of bonds for public improvements, was unwilling to leave the matter of providing the funds for the payment of the interest and principal of the debt to the mere judgment of the city officials. It was, therefore, by a positive enactment provided that an annual tax be levied sufficient in amount to meet both the interest and principal, as either becomes due. To do this, no doubt, was deemed safe, and hence it was made obligatory upon the city officials to levy such a tax. The very act, therefore, which conferred the

right upon the taxpayer to either give or withhold his consent to incur the obligation, also requires him to adopt the method prescribed for the payment of the obligation after it is created. The taxpayer thus cannot authorize, nor can the city officials issue, bonds without adopting the statutory method of payment. It should be kept in mind that in issuing bonds the city council acts merely as the agent of the taxpayers. This agency, however, is a public agency, the powers of which are prescribed and defined by law. The taxpayers, like all others, are thus charged with notice of the scope of the powers conferred upon such agency, since in submitting a proposition to vote bonds the city council cannot exercise implied or ostensible powers, as is sometimes the case with respect to private agents in assuming or incurring obligations for their principals. The taxpayers, in incurring a bonded indebtedness, cannot even authorize the city council to agree to any other method of payment than the one prescribed by the statute. If this be so, how can a taxpayer be heard to say, after the bonds are authorized by a majority vote, that he thought the city council had the power to pay them in any other manner than that prescribed by law? If he is permitted to urge this as an objection to the issuance of the bonds, it must be upon the theory that he is not required to take notice of the law, nor of the powers conferred thereby upon the city council. To so hold would result in permitting a voter to urge that he was misled because he thought there was no law upon the subject, and that he was led to think so because a public officer had made a statement to that effect, which was contrary to a positive statute upon the subject. To allow this would ultimately lead to permit a citizen to rely upon a statement made by a public officer with regard to such officer's power when its scope was clearly prescribed and defined by a positive statute. To what extent a citizen may obtain relief as against an offending officer as an individual, in case of a misrepresentation of this character, if at all, we need not consider. That such a complaint will

not be heard so as to affect public acts or interests is too elementary to require either discussion or authority. By what we have said we do not wish to be understood as promulgating a doctrine which in all cases and under all circumstances would preclude a taxpayer from preventing an issue and disposition of bonds which were authorized at an election called and held for that purpose, where the notice calling the election contained statements or inducements which were not required to be published as a part of the notice. Public officers may not, under all circumstances, make representations or statements which are calculated to mislead the voters, and when the acts of such officers, in that respect, are called in question, screen themselves by the statement that the statements and representations in such notice were not authorized by law, and that, therefore, the taxpayer is without relief because he is required to take notice of the law and govern himself accordingly. It may well be that under peculiar circumstances the taxpayer, by timely application before the bonds are sold, may prevent their disposition upon the ground that false statements and representations were contained in the published notice calling the election, although such statements and representations were not required to be published, and could not be acted upon by the officers charged with the duty of issuing and disposing of the bonds, and which would not affect the liability of the municipality after the bonds had passed into the hands of an innocent purchaser. Nor is it intended, by what we have said, to announce a doctrine contrary to the general rule, as laid down by the authorities, that the individual may in some instances be excused for being ignorant with regard to his rights which grow out of or are given him by the law, nor that he is in all cases charged with the knowledge of the law so as to prevent him from obtaining relief where fiduciary relations exist. The cases in which the maxim, "Ignorance of the law excuses no one," and the exception thereto, are stated, are collated in the notes to the foregoing maxim in 21 Cyc. pp. 1725 to 1727, to which the

reader is respectfully referred. In our view the facts before us have no application to the doctrine promulgated in the cases referred to in Cyc., nor to the cases where the rule and exceptions are usually applied. In this case the statement that is objected to did not relate to a matter which was involved in obtaining the voters' consent to issue the bonds, nor was it a misrepresentation of any existing fact. Neither was it a matter which was intended to be, or was or could be, submitted to the voters, but it was a matter which merely concerned the manner of raising the funds for the payment of the bonds, and that was absolutely determined by the very act which authorized the issuing of them. In this connection it may also be said that the very section of the act which provided how the funds for the payment of both interest and principal should be raised was referred to in the published notice, and thus by reference was made a part of it.

In the case of *State v. Topeka,* 68 Kan. 177, 74 Pac. 647, the Supreme Court of Kansas, in an action brought to prevent the disposition of bonds, in passing upon the question of a defective notice or proclamation calling the bond election, where the statute covered the subject which was claimed ought to have been stated in the notice, says: "The voters knew of this statutory provision, and in exercising their right of franchise did so in view of them. . . . The provision of the statute by reference became a part of the petition as well as part of the proclamation."

It is also conceded by plaintiff that the city council, as well as all the officers, acted in good faith in the matter, and that fraud was neither intended nor perpetrated by what was done.

In view of the foregoing, we are of the opinion that the statement contained in the notice did not amount to a misrepresentation. It certainly was not a misrepresentation of an existing fact. The statement was simply a proposition made by the city council upon a subject upon which it had no right to speak, because the statute determined what

should be done. If it was a misrepresentation at all, it was in the nature of a misrepresentation with regard to the law and not with regard to a fact. The statement may, therefore, be considered as mere surplusage and harmless. That similar statements in submitting questions to be voted for have been held mere surplusage, is illustrated by the following cases: *City of Santa Barbara v. Davis,* 6 Cal. App. 342, 92 Pac. 308; *Hamilton v. Village of Detroit,* 83 Minn. 119, 85 N. W. 933; *City of Cheyenne v. State* [Wyo.], 96 Pac. 244; *Yesler v. City of Seattle,* 1 Wash. 308, 25 Pac. 1014.

But if we should assume that the statement was in the nature of an inducement to the voters of which they may complain, then it constitutes what is termed an irregularity. It certainly cannot be said to be more than this. And as we have seen, it is not a matter that could have been submitted to a vote or voted upon at the election. Nor was it an irregularity in the proceedings, either before or at the election. It, therefore, was a matter which, if it had any effect at all, must be considered in the nature of an inducement to the voters to vote for the bonds. But there is no allegation or intimation even that any of the voters were in fact induced to vote for the bonds that otherwise would not have voted for them. Can an election be declared illegal because of some irregularity which it is not claimed affected the result thereof? The mere allegation that an irregularity occurred is not sufficient to authorize a court to declare the election illegal. If the matter complained of were one which in a sense were jurisdictional—that is, which went to the right of holding the election, or to its legality—the case might be different.

It is also conceded by the plaintiff that the bonds in question are issued in strict conformity with the statute, and that they contain a recital that both the payment of the interest and principal will be provided for as required by the statute, and not in accordance with the statement contained in the notice. The bonds, therefore, seem to be in conformity to law. We can discover no reason, therefore,

which would authorize us to prohibit the disposal of the bonds. The writ, therefore, should be, and accordingly is, denied. Costs to defendants.

It is so ordered.

McCARTY, C. J., concurs.

STRAUP, J., (concurring in result).

The statute which provides that notice of the election shall be published in a newspaper of the city does not prescribe the terms of the notice. While, no doubt, the city council was required to specify in the published notice the time, place, and purpose of the election, still I am of the opinion that it was not necessary to designate in the published notice the polling places of the various voting districts. I therefore concur in the conclusion reached that the published notice was not defective on the ground that the polling places were not specified therein.

I also concur in the conclusion reached that the writ should be denied on the second ground urged by the relator. I do not concur, however, on the theory advanced by the members of the majority court, that every one is charged with knowledge of and is presumed to know the law, or that the maxim, *"ignorantia juris non excusat,"* ignorance of the law is no excuse, or, as sometimes expressed, *"ignorantia legis neminem excusat,"* ignorance of the law excuses no one, should be applied. I know it is sometimes loosely said by courts and text-writers that every one is presumed to know the law. But there is no such presumption. That is not what the maxim means, and it is not applied in such sense by the courts who are mindful of its correct meaning. The declaration, many years ago, of Lord Mansfield, is as true now as then. He said: "It would be very hard upon the profession if the law was so certain that everybody knew it; the misfortune is that it is so uncertain that it costs much money to know what it is, even in the last resort." Said Mr. Justice Maule, in *Martindale v. Felkner,* 2 C. B. 719: "There

is no presumption in this country that every person knows
the law; it would be contrary to common sense and reason
if it were so." In speaking of the maxim, Mr. Justice
Campbell of the Michigan Supreme Court (*Black v. Ward,*
27 Mich. 191, 15 Am. Rep. 162) observed: "But the max-
im referred to in regard to a knowledge of the law is mis-
applied. No man can avoid a liability, as a general thing,
because he is ignorant of the law. This is an essential rule
of society. But the law is not so senseless as to make ab-
surd presumptions of fact." And, says Mr. Elliott, in his
work on Evidence, vol. 1, section 96: "But it is a perver-
sion of the maxim that ignorance of the law is no excuse to
say that every one is, under all circumstances, presumed to
know the law."

Ignorance of the law will not relieve one from, nor ex-
cuse him of, the legal consequences of his wrongful or neg-
ligent acts; nor will it relieve him from the legal effect of
his contract obligations. It is only in respect of such mat-
ters that the maxim is applicable, and it is only in such
sense that it may be said every one is presumed to know
the law. The rule is founded upon policy and in necessity.
It is, however, quite enough to say to one that he is presumed
to know the law when ignorance of it would relieve him
from the legal consequences of his wrongful or negligent
acts, or from a liability on a contract, without also saying
to him that he is charged with knowledge of and is pre-
sumed to know all the statutory and common law on a
subject, when he is not seeking relief from, nor excusing
or defending, a wrongful or negligent act, nor seeking re-
lief from contract obligations on the ground of ignorance
of the law. Policy and necessity do not require the maxim
to be carried that far. To say that every one is conclusively
presumed to know the law in such general sense is applying
the maxim too broadly, and is indulging a presumption which
every one from common experience and observation knows
is untrue. To say so is, I think, inconsistent with the max-
im, with law, and with reason. The law is not an exact

science. There are many nice distinctions about the law upon which the profession and the courts do and may well differ, and no one can say with certainty what the law with respect to them is until the questions are decided and determined by the court of last resort. The lawyer was not far wrong who told his client that he could tell him what he thought the law was on a certain question, but he could not tell him how the court of last resort would rule on it. When the profession and the courts differ, as they do on so many questions of law, it seems unreasonable to me to say that a mere layman is presumed to know what it is and is charged with knowledge of it. There is more reason for saying that every one is conclusively presumed to have knowledge of the principles of geometry than of the law, for the one is an exact science and the other so uncertain "that it costs much money to know what it is, even in the last resort."

Nor do I agree with the statements, loosely made by some courts, and with the principle intimated in the opinion of the majority members of the court, that relief cannot be given on the ground of mistake or misapprehension of the law. Courts from an early day have constantly, and do now, grant relief on such ground. In *Lowndes v. Chisolm,* 2 McCord, Eq. [S. C.] 455, 16 Am. Dec. 667, it is said: "It is well established that relief is given in cases where the mistake has been clearly one of law, and the authorities relied on put the matter beyond all doubt, if, indeed, it could be doubted at this day." In speaking of the maxim, Mr. Kerr says: "If a man, through misapprehension or mistake of the law, parts with or gives up a private right of property, or assumes obligations upon grounds on which he would not have acted but for such misapprehension, a court of equity may grant relief, if, under the general circumstances of the case, it is satisfied that the party benefited by the mistake cannot, in conscience, retain the benefit or advantage so acquired." Kerr on F. & M. 389, quoted in *Macknet v. Macknet,* 29 N. J. Eq. 59, and approved in *Freichnecht v. Mayer,* 39 N. J. Eq. 559, and in *Swedesboro Ext. Ass'n v. Gans,* 65 N. J. Eq. 132, 55 Atl. 82.

That mistakes in law may afford good cause for relief in cases other than a fiduciary relation is well illustrated by numerous cases of American courts cited and collated in notes to the case of *Alabama, etc., Ry Co. v. Jones*, reported in 55 Am. St. Rep. 503, 504. It is not necessary now to go into the particulars to ascertain when relief will be granted in such case. It is enough to know that the maxim is not so broad that ignorance or mistake of the law is no ground for either defensive or affirmative relief. It is not even so broad in its application that a mistake of law cannot be shown to ascertain the state of one's mind or motive. (*Schott v. Dosh*, 49 Neb. 187, 68 N. W. 346, 59 Am. St. Rep. 531.)

I am further of the opinion that the maxim is inapplicable because the statement was one of fact and not of law. After stating in the published ordinance and in the published notice that the question was submitted of incurring a bonded indebtedness of $475,000 for the purpose of improving and enlarging the water supply of the city, and $125,000 for the sewer system, the city council, in referring to the water bonds, also specified in the ordinance and notice so published that "the net revenues from said water system shall be set apart for and shall be a sinking fund for the payment of said bonds and interest thereon;" and in referring to the sewer bonds it was specified in the published ordinance and notice that "the city council shall annually levy a sufficient tax to pay the interest on said sewer bonds as it falls due and also to constitute a sinking fund for the payment of the principal thereof." It is thus seen it was expressly provided in the published ordinance and in the notice published to the electors that the principal and interest of the water bonds should be paid from the net revenues derived from the improved and enlarged waterworks system, and that the principal and interest of the sewer bonds should be paid by annually levying a tax. I think such a statement calculated to induce electors to believe that the proposed indebtedness of the water bonds, if created, would be paid from the net revenues derived from the waterworks system, and

that no increased burdens would be placed on their taxable property for the payment of interest or principal of such an indebtedness, and hence some of the electors may have been induced or misled by such statement to vote in favor of creating such an indebtedness who otherwise might not have done so.

True, it was provided in the statute itself that the city council should annually levy a sufficient tax to pay the interest of such a bonded indebtedness as it falls due, and to constitute a sinking fund to pay the principal; and it was further provided that in submitting to the voters the question of incurring such a bonded indebtedness the city council was only required to specify the particular purpose for which the indebtedness was to be created and the amount of bonds proposed to issue. It may therefore be conceded that the city council was not required to specify in the published ordinance or notice the manner of paying the proposed indebtedness, and that it was not necessary to submit such a question to the electors. But it must be remembered that to legally create such an indebtedness it was essential to obtain the consent of the majority of the qualified electors (those who paid a property tax in the year preceding the election) voting on the question of creating the indebtedness. To properly obtain their consent the city council was required to give them notice of the particular purpose of the indebtedness, the amount of bonds proposed, and the time and place of the election. Now, it may be said, with much force, a voter voting in favor of the question submitted did so upon the terms and conditions expressed in the notice; and though the city council was not required to submit to the voters the question as to the manner of paying the proposed indebtedness, still when it submitted to them the question of creating a bonded indebtedness of $475,000 to enlarge and improve the waterworks system on the terms and conditions that the interest and principal of such an indebtedness should be paid from the net revenues derived from the waterworks system, a voter voting in favor of such

a question did so on such` terms and conditions; and, since the bonds cannot be paid in such manner, no indebtedness was legally created, and the city council is unauthorized to issue the bonds. But since such matter was not required to be specified in the published notice, I am not inclined to indulge in such a conclusive presumption, and hold the election absolutely void. On the other hand, since the electors could not lawfully create a bonded indebtedness by consenting and agreeing to have it paid in the manner specified in the published notice, I cannot indulge in another conclusive presumption—that their consent was given to create such an indebtedness upon the condition that it be paid as provided by the statute. That is to say, one who may have given his consent to create such an indebtedness on the condition that his property should not be taxed has not given his consent to create such an indebtedness on the condition that his property should be taxed. To say, as in effect do the majority members of the court, that the electors were not in law misled by such statement in the published notice, and were not induced thereby to vote in favor of creating the indebtedness, on the theory that they were required to take notice of the statute and conclusively presumed to know that the city council could not lawfully pay the interest and principal of the indebtedness in manner specified in the published notice, and for that reason presumed to know that the facts so declared were untrue, and hence the electors not influenced or deceived thereby, is not only misapplying the maxim, that ignorance of the law is no excuse, but is also the making of conclusive presumptions of fact. To say that the electors were not misled by the statement because the city council were not required to speak on such a subject, is, I think, also unsound. A statement made by one not required to be made may have the effect to influence or mislead another quite as much as a statement of something which one was required to make. There are many instances where one may indeed remain silent; but when he speaks and speaks falsely, he may not defend or excuse

his misrepresentation on the ground that he was not required to speak in the first instance.

I think the question whether the electors were misled by the statement in the published notice is one of fact. Being one of fact, I think the relator was required to aver and show that a sufficient number of the qualified electors voting at the election were misled by the statement and induced to vote in favor of creating the indebtedness, who otherwise would not have done so, to change the result of the election. There being no such averments, I concur in the conclusion reached denying the writ. I recognize the general rule that, when bonds have passed into the hands of innocent purchasers for value, a mere irregularity in the proceedings by which they were issued does not ordinarily furnish ground for assailing them. But these bonds have not passed into the hands of such a purchaser. They have not yet been issued by the municipality. This application is made for the purpose of preventing the municipality from issuing the bonds and disposing of them. The application is therefore timely.

I also do not agree in the holding that the relator cannot be heard to say that the electors were misled by the false statement in the published notice on the theory of an agency existing between the electors and the city council.