Frank J. Hartmann *et al.* Appellees, *vs.* The Pesotum Community Consolidated School District No. 52 *et al.* Appellants.

*Opinion filed April 20, 1927.*

1. Schools—*what should be considered as increasing bonded indebtedness of a school district.* In a suit to enjoin the building program of a school district on the ground that the bond issue for the purpose was in excess of the constitutional limit of indebtedness, building contracts which are payable out of the proceeds of the bonds should not be regarded as increasing the indebtedness of the district nor should accrued interest on the bonds up to the date of the contracts be so considered, and where the bond issue does not exceed the constitutional limit of indebtedness the question whether subsequent tax levies for current expenses for educational purposes may exceed the constitutional limit cannot affect the validity of the building contracts.

2. Same—*when school board has discretion as to character and cost of proposed school building.* Where there has been an election authorizing the erection of a proposed school building and the issue of bonds, and no limitation is placed upon the school board by the vote of the people as to the kind, character and cost of the building, the school board has a right to use its own discretion as to the kind of building which will be adequate and proper for the use of the district, and if additional funds are necessary to complete such a building the board may make tax levies for its completion, provided such levies do not exceed statutory provisions.

3. Same—*rights and duties of succeeding board of education in regard to building program.* While one board of education cannot dictate building plans or policies to future boards, on the other hand a succeeding or subsequent board of education cannot undo what the former members have legally done, cannot refuse to accept a

building so far as completed by the contractor employed by the former board, and cannot refuse to pay such contractor his legal demand for his work if completed according to the contract.

4. SAME—*board of community consolidated district may adopt part-time high school course.* Under section 114 of the School law, authorizing school directors to direct what branches of study shall be taught, the board of education of a community consolidated school district may determine to conduct a three-year high school notwithstanding a portion of the consolidated district is within a regular high school district, and residents in the overlapping territory cannot escape the payment of taxes for a school building in the consolidated district merely because a part-time high school course is conducted in the building.

APPEAL from the Circuit Court of Champaign county; the Hon. GEORGE A. SENTEL, Judge, presiding.

GREEN & PALMER, (HENRY I. GREEN, and ORIS BARTH, of counsel,) for appellant G. A. Applegate.

LITTLE & FINFROCK, and HERRICK & HERRICK, for other appellants.

DOBBINS & DOBBINS, LOUIS A. BUSCH, and EARL C. HARRINGTON, for appellees.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Pesotum Community Consolidated School District No. 52 of Champaign county, consisting of four common school districts, one of which included the village of Pesotum, was organized under the provisions of sections 84a to 84f of "An act to establish and maintain a system of free schools," as amended by the act approved June 24, 1919, pursuant to an election held in the district November 2, 1920. A board of education was thereafter elected, and it organized and assumed jurisdiction over the district. An election was later held, by which a majority of the voters authorized the selection and purchase of a school site and the erection thereon of a school building. Thereafter

the board of education was authorized, by a majority of the voters at an election held to issue bonds to the amount of $40,000, to purchase the site and to build thereon a school building. The school board proceeded to purchase the site and provide for a school building thereon, and on March 31, 1921, made an agreement with an architect for the preparation of necessary plans and specifications for the building of the school building, which were later approved. On May 28, 1921, the school board by its secretary mailed to a number of bond houses a proposition of the board to the effect that it would offer to sell bonds in the amount aforesaid, and stated in the letter or notice that bids were to be made on the basis that the school board would secure the opinion of approved attorneys on the validity of the bonds, print them and bear the other expenses in connection therewith. The board received bids for the purchase of the bonds, among which was one by Powell, Garard & Co. proposing that for $40,000 of legally issued six per cent school bonds of the district, delivered in Chicago, dated on or about July 1, 1921, that company would pay par and accrued interest, less $180 for blank bonds and expenses; that the district should furnish at its cost a full and complete certified transcript of the proceedings of the board evidencing the legality of the bonds, and an $800 check accompanied the bid, which was to be applied as part payment on the bonds if the bid was accepted. On June 1, 1921, the school board held a meeting, at which all members were present, and voted to accept the bid of Powell, Garard & Co. for the bonds under the terms proposed. Thereafter the board received from Powell, Garard & Co. the forty printed $1000 blank bonds, numbered from 1 to 40, all bearing date July 1, 1921, and bearing six per cent interest from date, payable semi-annually, with coupons attached for the interest. These bonds were duly executed in accordance with a resolution of the board and delivered to the treasurer of the district, who was to de-

liver them to the purchaser on receipt of the money to be
paid therefor.   On July 1, 1921, the board met and pro-
vided for the collection of a direct annual tax sufficient to
pay the interest on the bonds as it fell due and also to pay
and discharge the principal thereof, in accordance with the
provisions of section 12 of article 9 of the State constitu-
tion.   The bonds were to become due serially, beginning
with No. 1, and for the years 1924 to 1927, inclusive, eight
of the bonds were to mature, two bonds each year; for the
years 1928 to 1935, inclusive, three bonds each year were
to fall due; and for the years 1936 and 1937 four bonds
each year were to fall due.   About July 1, 1921, bids for
the construction of a school building in accordance with the
approved plans were received, the bids ranging from about
$50,000 to $60,000.   The board unanimously voted to re-
ject all bids on the ground that some bidders thought a
lower bid could be obtained as materials had decreased in
price.   On July 23 all members of the board voted for a
tax levy of $6000 for building purposes and $10,000 for
educational purposes for the coming year.   On August 20,
1921, a petition was received and filed requesting the call-
ing of an election for the purpose of voting on the question
of the dissolution of the district.

On September 14, 1921, Frank J. Hartman and thirty-
two others, tax-payers and owners of real estate in the
school district, filed in the circuit court of said county a
bill for injunction against the school district, Frank Davis
as president, and C. W. Meneley, Henry Pfeffer, B. C. Holl,
E. R. Eichhorst, Ira M. Cooper and G. L. Siefken as mem-
bers of the board of education, and Powell, Garard & Co.,
alleging that the district was threatening to issue bonds in
the sum of $40,000, which sum would so increase the in-
debtedness of the district as to make it greatly in excess of
the constitutional limit.   All defendants entered their ap-
pearance, and on October 29, 1921, filed answers to the bill
and asked for an immediate hearing.   After the filing of

the answers complainants ascertained that the board of education and the bond purchaser had closed the deal for the $40,000 of school bonds about the time of the filing of the bill for injunction, and that on September 28, 1921, the school board re-purchased fifteen of the forty $1000 bonds and then re-sold to the purchaser nine of the fifteen bonds, thereby leaving only thirty-four of the forty $1000 bonds outstanding against the district. They further ascertained that the members of the board of education, except Holl and Pfeffer, had determined to build a school building in substantial compliance with the plans and specifications submitted by the architect and approved by the board but would only partially complete the building under the first contracts they would let; that on November 10, 1921, they had received bids for the excavation of the foundation of the building and for the erection of the building on the building site, omitting the plumbing, heating, lathing, plastering, interior trim and hardware, finishing the double floors, and some other inside finishings, and on the same day had let the contract for excavation to John Robbins, for which he was to receive $224.67, and the contract to build and complete the building, except as aforesaid, to G. A. Applegate for the contract price of $28,377, and that the majority of the board contemplated completing the building by subsequent contracts at such times as it could provide the funds therefor by the further sale of bonds and tax levies for building purposes.

On November 17, 1921, complainants dismissed the bill of complaint as to the defendant Powell, Garard & Co., and on February 1, 1922, by leave of court filed an amended bill against the remaining parties in the original bill, praying that they be restrained from issuing, delivering or selling any bonds of the district so as to impose upon it an indebtedness in excess of the constitutional limit; that they be restrained from paying, or levying or collecting any tax for paying, any part of the bonded indebtedness which the

court may determine to be illegal, and for general relief. It was alleged in the amended bill, in substance, that the constitutional limit of indebtedness of the district did not exceed $40,800, and that the defendants were attempting to impose upon the district, by the issuance and sale of bonds, an indebtedness of $40,000 in addition to that for current expenses, such as teachers' salaries, contracts for transportation of pupils, services of a janitress, rent of room for school purposes, coal and other expenses, all of which debts would exceed the maximum allowed by the constitutional limit by approximately $10,000.

Complainants in the original bill also filed in November, 1921, a supplemental bill, and on February 1, 1922, an amended supplemental bill, which was amended on February 8, 1922. They made as parties defendant to the amended supplemental bill as amended, the school district, the president and members of the board of education, G. A. Applegate, John Robbins, and Everett Davis, as treasurer of the district. The prayer of this latter bill is that the defendants Applegate and Robbins be restrained from proceeding further with the erection of the building enclosure and from collecting any payments out of the funds of the district on their building contracts; that they be ordered to re-pay to the district any payments received by them on their building contracts; that the members of the board of education be restrained from making any payments on said contracts and that they be required to re-pay to the district the amount they have paid thereon; that they be restrained from maintaining a high school in the district and from imposing taxes on any lands in the district that are also located in the Villa Grove township high school district, for the purposes of building a high school building or maintaining or conducting a high school in the defendant district; that Davis, as treasurer, be restrained from paying orders drawn by the school board pursuant to said building contracts or for any high school pur-

poses, and that he be required to replace in the district's funds held by him all payments made by him or that may be made by him on the building contracts aforesaid, and for general relief.   On February 16, 1922, the defendants Applegate, Robbins, the school district, and Everett Davis as treasurer, filed a general and special demurrer to the amended original bill and to the amended supplemental bill as amended, which was overruled by the court on March 13, 1922.

At the school election in the district in April, 1922, Henry Pfeffer was elected president of the school board to succeed Frank Davis as president, and another director was elected to succeed G. L. Siefken as director.   The newly elected members of the board did not favor the program of the former majority of the board as to completing the new building and conducting the school.   As a result thereof B. L. Kirk was authorized to enter his appearance as solicitor for the district and to withdraw its answer on file and to make its election to stand by its demurrer to the amended original bill and to the amended supplemental bill as amended.   This action of the school board necessitated the withdrawal of answers to those bills by Frank Davis as former president, and other defendants, and the filing of new answers.   Answers were later filed to the amended original bill and the amended supplemental bill as amended, by C. W. Meneley, E. R. Eichhorst and Ira M. Cooper as members of the school board, Everett Davis as treasurer, John Robbins and G. A. Applegate, and Frank Davis and G. L. Siefken as former president and former member of the board.   The answers of B. C. Holl and Henry Pfeffer to the original bill had been previously withdrawn by them as unauthorized, and they thereafter filed no answer to any of the bills and defaults were taken against them.

On June 23, 1922, the cause was referred to the master in chancery to take the proofs and report the same to the court, together with his conclusions of law and fact.   The

master's report was filed February 7, 1924, in which he found for complainants as to all their contentions in the amended bills. He recommended to the court a decree in accordance with the relief prayed in both the amended bills. Objections were filed to the findings and report of the master, which were overruled and exceptions to the same were heard by the court. The court sustained the exceptions of the defendants to the master's holding that accrued interest on the $34,000 of bonds should be included as an indebtedness of the school district on November 10, 1921, in passing on the legality of Robbins' and Applegate's building contracts on that date. It also sustained exceptions to the master's holdings that Robbins' contract was invalid, and that the district should be restrained from maintaining or conducting a high school, etc. The court overruled all other exceptions, and entered a decree enjoining the issuance of bonds in excess of $34,000 and the levy and collection of any tax to pay such excess; that the remaining $6000 in bonds be canceled; that the building contract with Applegate be decreed void; that Applegate, the members of the school board who favored the execution of the contract with him, and the school treasurer, should re-pay to the school district the sum of $21,766.30—the amount paid Applegate on his contract; that in default of re-payment execution should issue, and upon re-payment the defendants might remove the building, provided that if they remove it they shall restore the grounds as nearly as possible to the condition in which they were prior to the commencement of the erection of the building. From that decree the defendants affected thereby prosecuted this appeal.

The evidence in the record shows that the members of the board of education were in complete harmony with reference to the building of the school building in accordance with the plans of the architect submitted and unanimously approved March 31, 1921. They were a unit on selling the $40,000 of school bonds to purchase the school site and to

build the school building and to make the proper levies for payment of the interest and principal. They unanimously agreed on the employment of teachers and in the making of contracts for the other current expenses for educational purposes for the coming school year, all of which contracts were made after the bid of the bond purchaser for the bonds was accepted, on June 1, 1921, except the employment of one teacher at a total salary of $1035, which contract was made on the same day. The first dissenting vote on the proposition of issuing the $40,000 bonds occurred on August 20, 1921, on the final resolution to issue those bonds "to purchase a site and build a school building," all voting for the resolution except B. C. Holl, who voted "no." That was the day the board received the petition "to call an election to vote upon the proposition of dissolving the district." After that meeting the board stood four to two in voting on every proposition as to building a school building, paying for the school site and building, or paying building contracts, paying the architect, employing or paying counsel to defend the injunction proceedings, and issuing bonds or doing other acts to complete the school building. The president of the school board was with the four members of the board on the "aye" side of the questions aforesaid, and they are referred to in the record as the "majority members of the board." The first bids on the school building seemed to be much higher than was expected by any of the members of the board and were rejected for the reasons aforesaid. The majority members of the board determined that the district needed and required such a building as the plans and specifications called for, and that they could build sufficiently before the fall of 1922 to have the building in comfortable shape for use when school should begin and without incurring any indebtedness in excess of the constitutional limit. The evidence shows clearly that they could have accomplished their purpose and determination, as herein later shown. The minority mem-

bers were agreed that the district needed and required such a building as planned by the architect, but contended that it would cost more than the money the $40,000 of bonds would furnish, and that the building should not and could not be built by the district.

On the ability of the district to build the school building, make it usable for the school year beginning with the fall of 1922, and thereafter complete it without exceeding the limit of valid indebtedness the record shows these facts: The treasurer of the district received on September 16, 1921, from Powell, Garard & Co., as proceeds of the bond sale, $40,493.33, which was principal and accrued interest on the bonds up to September 14, 1921, showing that Powell, Garard & Co. must have mailed a draft or some other instrument in payment of said sum on that day,—the same day the original bill was filed.  On September 28, 1921, the treasurer paid the bond purchaser $188 for printing the bonds and other expenses, leaving as net proceeds of the sale $40,305.33.  On September 28, 1921, to reduce the bonded debt to $34,000, which would be certain not to exceed the debt limit, the school board re-sold to the purchasers fifteen bonds, numbered 26 to 40, inclusive, for $15,185, and on the same day re-purchased nine of the bonds, numbered 26 to 34, inclusive, for $9111.  The district realized out of these transactions as the net proceeds of their bond sales $34,231.33.  There was in the building fund on March 30, 1921, $683.60, the proceeds of the sale of an old school building on another site belonging to the district.  On October 14, 1921, there was placed in this fund the further sum of $420, the proceeds of the sale of another old school building and an old toilet belonging to the district, making a total building fund of $35,334.60, including proceeds of the school bonds.  On July 5, 1922, the treasurer received from the county treasurer the $6000 levied and collected as a building fund for the years 1921 and 1922.  The constitutional limitation on indebtedness

in the district was $40,760.25 in 1921, as that was five
per cent of the value of the taxable property in the district
in 1920. After paying out interest on the bonds, amount-
ing to $2040, and all existing claims against the building
fund for the years 1921 and 1922, except a balance of
$928.35 due the architect for commissions and $6610.70
due Applegate on his building contract, the treasurer of the
district had a balance in the building fund in the sum of
$10,516.42. If Applegate and the architect had been paid
their claims in full the treasurer would still have had a bal-
ance in the building fund of $2977.37, which would be
available on July 10, 1922, for the further completion of
the school building. On July 1, 1921, the treasurer had a
balance of $5885.43 for educational purposes. On May 27,
1922, he received from the county superintendent of schools
the sum of $3200 as non-high school tax, and on July 5,
1921, from the county treasurer $9837.44 of the $10,000
levied in 1921 for educational purposes. On July 10, 1922,
after paying out every claim against the district for any and
every educational purpose, the treasurer had as a balance
in his hands $7917.09.

The first contention of appellees is that the constitu-
tional limit of indebtedness was exceeded at the time of
the letting of the building contracts to Applegate and Rob-
bins on November 10, 1921. They admit that the bond
transactions were legal, and their counsel say in their brief
that they do not contend that any of the outstanding bonds
were unlawfully issued. They further say that the district
unquestionably had the right to issue bonds to the amount
of $34,000. These admissions are inconsistent with their
contention that the building contracts were void. They
argue that the building contracts were illegal because at
the time they were made the bonded indebtedness, added
to the other debts for educational purposes contracted be-
fore the building contracts were executed, exceeded the
debt limit by $2138.74, as found by the master in chan-

cery, which sum includes $736.67 interest accrued on the bonds on the date the building contracts were made. The court agreed with this finding, but excluded from the calculation the $736.67 accrued interest and found that the excess indebtedness was $1402.07. If there was any indebtedness incurred by the district in excess of the constitutional limit it occurred after the bonds were purchased and by levying for educational purposes for 1921 and 1922. Those levies are not questioned by appellees, and whether or not the constitutional limit was exceeded in levying for current expenses for educational purposes is not a proper issue in this case. The building contracts of Applegate and Robbins did not increase the debt of the district, because they were payable out of the proceeds of the bonds in accordance with the vote of the people of the district. The same is true of the indebtedness to Eichhorst for the building site. Those three obligations were by the votes of the people to be satisfied out of the proceeds of the bond sales, and the members of the board of education had no right to divert or use the proceeds of the bonds for any other purpose. They could have been enjoined from using the funds for any other purpose. This court held in *Maffit v. City of Decatur,* 322 Ill. 82, that the initial payment on a contract by a municipality out of funds in its treasury can not be considered as. an indebtedness where the check for the same is given on the date of the contract and is paid out of current funds in its treasury. We hold in this case that the employment of a building contractor by a municipality to build for it a building to be paid for out of a building fund that has been dedicated or set aside solely for that purpose does not have the effect of creating a debt against the municipality. In addition to the fact that the bonds were voted for the express purpose of purchasing a school site and building thereon a school building, the school board on November 10, 1921, after Eichhorst had been paid for the school site out of the proceeds of the bonds, passed

a resolution appropriating the remainder of the proceeds of the bonds (over $29,000) for the sole purpose of payments on contracts to be enterted into for the construction of the school building. These building contracts were legal. Robbins was properly paid in full for his contract out of those funds. Applegate was so paid the sum aforesaid out of the same funds and was legally entitled to be paid the remainder due him.

Appellees further contend that the contracts with Robbins and Applegate were contracts for the erection of a mere shell of a building, that could not have been used for a school building in the fall of 1922 after expending on it all the funds of the district that could be legally raised for that purpose and which could not be completed without incurring indebtedness beyond the constitutional limit. They further charge that it was the purpose of the board to commit the district to such purpose, and that in pursuing such purpose the majority members of the board have unlawfully and designedly wasted the funds of the district and should be held to reimburse it for such unlawful waste, etc. The record evidence does not sustain these charges. All outside work on the brick building was completed, including the roof of the structure. The doors and windows were in place and a great deal of inside work had been done. The photograph of the structure in the record presents it as a very handsome, well designed, up-to-date, completed brick building, to all outward appearance. The evidence further shows that by the expenditure of $9500 or less after the building contracts aforesaid had been completed, the building would have furnished much better quarters for school purposes in the fall of 1922 than were available or in use at that time, and that the district was able to raise that amount of money without exceeding the debt limit; that it would have the further ability to complete the building as planned within a few years by additional expenditures on the uncompleted and least essential

parts of the building, such as the gymnasium, wiring for electric lights, waterworks pressure, etc.

As evidence of the district's ability to raise the funds for future building, we may call attention to the fact that on July 10, 1922, the district would have only had an indebtedness of $34,000 after all claimants were paid, including Applegate and the architect. It could have sold the remaining $6000 of bonds and still have had a debt of $760.75 under the constitutional limit. The evidence also shows that in the district it has two other old school buildings on another school site for sale and which the majority members of the board had contemplated selling. The lowest valuation in the record as to the cash market value of these buildings and lots was $3500. It had in its treasury over $2977 of building fund after deducting all claims against it. It also had over $7900 educational funds after all claims against it were paid. It also had sufficient furniture in the way of desks, tables and seats for the pupils until newer and better furniture could be purchased.

In making this decision our holding is that the school district is committed by the action of the majority of the members of the old board to no plan of finishing the new school building. We simply hold that the building can be completed according to the plans and intentions of the majority members of the old school board; that the old board had the right, and it was its duty, to make its determination as to the character of building that should be built, as there was no limit or indication otherwise by the vote of the people of the district; that it exercised its discretion in that particular honestly and without any intention to defraud the district or waste its funds; that the new school building is legally the property of the district and that it must pay all building contracts against it, including the architect's commission already earned, and that it may then complete and use the building according to the determination of any future board of education or other legal determi-

nation by the district. This court has frequently held that where no limitation has been placed upon a school board by the vote of the people it has the right to use its discretion as to the character and cost of a school building which shall be adequate and proper for the use of the district. Where the people have voted to build a school building and have authorized the issuing of bonds for that purpose, the school board has the right to make tax levies, within statutory limits, to complete the building if additional funds are required. (*People* v. *Scott,* 300 Ill. 290; *People* v. *Crear,* id. 611; *People* v. *Peoria and Eastern Railway Co.* 216 id. 221; *Wabash Railroad Co.* v. *People,* 202 id. 9; *People* v. *Chicago and Texas Railroad Co.* 223 id. 448.) There were no temporary injunctions issued in this case. The members of the former board of education acted within their rights and duties under the law as a board of education. While they could not dictate building plans or policies to future boards of education, on the other hand a subsequent board of education had no legal right to undo what the former members had legally done. There was no legal right in the new board of education to refuse to accept the building so far as completed by Applegate and refuse to pay him his legal demand for completing it, as the architect's certificate shows he completed it according to his contract, under the plans and specifications furnished him.

The evidence in the record does not sustain the court in its decree that the remaining $6000 of the school bonds be delivered up and canceled. The vote of the people authorized the sale of $40,000 of school bonds to purchase a school site and to build thereon a school building. There is no evidence in the record, so far as we are able to see, that warranted this part of the decree. The district is apparently in need of that amount of money in addition to the amount it has already obtained from the sale of school bonds to complete the building, if the district shall desire so to do. The tax-payers, complainants in the bills afore-

said, are entitled to no decree, so far as the evidence shows, to have the vote of the people of the district thus annulled, as their charge that the school board was attempting to issue bonds in excess of the constitutional limit was not proved.

Appellees have assigned cross-errors upon the holding of the chancellor that the accrued bond interest was not an existing indebtedness on November 10, 1921, when the building contracts in question were executed. What we have already said disposes of the question that the court erred in so holding. The legality of those contracts depended simply upon the question of the legality of the bonds, as already stated, and not upon the question of the amount of the intervening indebtedness for school purposes between the date the bonds were in force and the date of the building contracts.

Appellees also assign cross-errors to the effect that the court erred in failing to enjoin the district from erecting a building designed wholly or in part for high school purposes, and from levying any taxes or expending any money derived therefrom for the purpose of maintaining a high school, so long as a part of the district is taxed for the maintenance of a high school in an overlapping high school district. This contention is based upon the fact that the evidence tends to show that the territory of the Villa Grove high school district overlaps and includes a part of the appellant district. The powers of boards of education of community consolidated school districts are the same as those of boards of education in common school districts having a population of 1000 or more and not exceeding 100,000. The powers of boards of education of the latter districts are the same as the powers of school directors as defined in section 114 of the School law, and in addition thereto other powers as defined in section 127 of that law. School directors, under section 114, are expressly given the power "to direct what branches of study shall be taught, what text books and apparatus shall be used, and to en-

force uniformity of text books," etc. Section 93 of the School law recognizes the fact that there are a number of common school districts in the State that maintain two-year or three-year high schools, and the right of such common school districts to maintain such two-year or three-year high schools has never been questioned so far as we know, and we do not think that it can be successfully questioned. The evidence shows that the board of education of the appellant district has determined to conduct a three-year high school, and that the new school board in existence after the election in 1922 continued to conduct such high school. The lower court had no jurisdiction to enjoin this determination and action of the school board. Those residents that are in the appellant district and also in the Villa Grove high school district are in duty bound, under the statute under which the appellant district was organized, to pay taxes in that district for conducting the school in the appellant district. Their property is taxable for the purpose of building such a school building as shall be determined by the board of education of that district, and they cannot escape such taxation because of the fact that a three-year high school course is conducted in the school building thus determined as a suitable building for the district. If the lower court had jurisdiction to determine what part of the school building or what part of its cost was for high school purposes, only, the record furnishes no basis for such determination. The court committed no error in overruling this contention of appellees.

The decree of the circuit court is reversed and the cause remanded, with directions to dismiss the amended bill and the amended supplemental bill as amended for want of equity.

*Reversed and remanded, with directions.*