(No. 16378.—Decree affirmed.)
ROBERT U. MAFFIT, Appellant, *vs.* THE CITY OF DECATUR
*et al.* Appellees.

*Opinion filed June 16, 1926.*

1. MUNICIPAL CORPORATIONS—*when city does not exceed limit of indebtedness by contract with water supply company.* Where a city, within the limit of its indebtedness, is able to construct a new dam in a river in order to provide sufficient water to meet its needs but is unable to purchase the site of the reservoir so formed, the organization of a private corporation to purchase the site and a contract with the corporation by which the city is to pay for the use of the reservoir a certain share of its water rents are not invalid as an evasion of the constitutional limitation of the city's indebtedness, where there is no showing that an indebtedness in excess of the constitutional limitation is or will be created by such arrangement, and where no obligation is imposed upon the city to pay the corporation in case the water rents fail to reach the minimum prescribed by the contract as the company's share.

2. SAME—*burden is on tax-payer to prove city's contract in excess of limit of indebtedness.* In a suit by a tax-payer to enjoin the performance of a contract executed by a city as being in excess of the city's limit of indebtedness, the burden is on the tax-payer to show the contract violates the constitutional limitation.

3. SAME—*when city does not loan its credit to private corporation.* Where a city lacks both the money and credit to obtain additional facilities necessary to supply water to its inhabitants, a contract with a water supply company by which the city is to pay a certain sum of money and a share of its water rents and to vacate certain streets and alleys for the use of the company's reservoir by the city does not constitute a loan or donation of the city's credit to the corporation, in violation of separate section 2 of the constitution.

4. SAME—*when contract with water supply company under section 1 of act of 1872 is valid.* Under section 1 of the act of 1872, as amended in 1885, authorizing cities to contract for a water supply, such a contract is valid although the city owns a part of the equipment by which the water is supplied; and such contract need not be submitted to a vote of the electors of the city, and competitive bids are not required before the execution of the contract.

5. SAME—*reasonableness of ordinance authorizing contract for water supply is primarily for city council—burden of proof.* If an ordinance authorizing a contract for a water supply is otherwise valid, the determination of the question whether it is reasonable

and necessary is committed in the first instance to the municipal authorities, and one who attacks a contract based upon such ordinance, on the ground that the contract is unreasonable, has the burden of establishing the charge.

6. SAME—*what payment does not create an indebtedness.* The initial payment on a contract by a city cannot be considered as an indebtedness where the check is given by the city on the date of the contract, as specified therein, and is paid out of current funds of the city then on hand.

APPEAL from the Circuit Court of Macon county; the Hon. JAMES S. BALDWIN, Judge, presiding.

WILEY & MOREY, W. K. WHITFIELD, JESSE L. DECK, and W. THOMAS COLEMAN, for appellant.

LEE BOLAND, Corporation Counsel, RALPH J. MONROE, C. A. McMILLEN, and R. P. VAIL, for appellees.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Robert U. Maffit, a resident and tax-payer of the city of Decatur, on behalf of himself and other tax-payers, filed an amended bill in the circuit court of Macon county against the city of Decatur and the Decatur Water Supply Company, a corporation. The bill sought to have a certain contract dated April 4, 1921, entered into by the two defendants declared void and the carrying out of its provisions enjoined. Separate answers were filed by the defendants, admitting the execution of the contract, averring its validity and denying the right to the relief prayed. The Decatur Water Supply Company's answer replied seriatim to certain interrogatories propounded by the amended bill. The cause was referred to a master in chancery, who heard the evidence and filed a report recommending the dismissal of the amended bill for want of equity. The complainant and the water supply company filed objections to the master's report. These objections were overruled and ordered to stand as exceptions. The circuit court overruled the ex-

ceptions, approved the master's report and entered a decree dismissing the bill for want of equity at the costs of the complainant. He prosecutes this appeal from that decree.

On April 4, 1921, the city of Decatur had about 44,000 inhabitants. The city is under the commission plan of municipal government. Its source of water supply is the Sangamon river, which flows past the city to the east and south. Before the contract in question was executed the city owned a water supply system which comprised a pumping station, filtration plant, water mains and a dam in the river by which water was stored for the city's use. The system was worth approximately $1,000,000. The number of water consumers increased about three hundred annually, and the dam was too small to impound sufficient water to meet the growing demands of the city. The construction of a new and larger dam across the river,—one that would impound the water to a height of 610 feet above the sea level,—was begun July 1, 1920, and completed about September 15, 1921. The new dam cost the city $807,-683.56. Its cost was defrayed, in part, by the issuance of $601,000 in bonds. The city's total indebtedness on April 4, 1921, including these bonds, was $863,000. The assessed valuation of all property within the city, at the time, was $16,479,320, five per cent of which, the maximum indebtedness permitted by the constitution, was $823,-966. There existed, however, a sinking fund created for the sole purpose of discharging *pro tanto* the city's bonded indebtedness. On April 4, 1921, this fund consisted of $75,975.10 in cash and $21,535.41 in securities, and it was augmented by $49,200 of the annual tax levy, a considerable portion of which had been collected. The sinking fund, apart from the tax levy, amounted to $97,510.51 on the day in question.

The construction of the new dam was only a partial solution of the city's problem. The completed dam, it was discovered, would impound water to such a height that

3300 acres of land would be inundated and a considerable portion of the land would have to be cleared before it could be used for a reservoir. Changes in the locations of certain roads and bridges above the dam, the raising of their grades and the construction of new bridges would also be made necessary. Before the dam could be made effective the city would have to acquire the right to inundate the land and make the consequent changes and improvements. It was admitted that $1,000,000 would be required for these purposes, but the city had neither the money nor the credit to raise that sum. Ways and means to consummate the plan were discussed by city officers and public spirited citizens and organizations of Decatur. It was found that the city could not finance the project and it was determined that it would have to be done by individuals or a private corporation. Accordingly the Decatur Water Supply Company, a domestic corporation, was organized. Its charter was granted on February 2, 1921. The objects for which it was formed, among others, were to acquire land for a reservoir for the storage of water; to construct and maintain such a reservoir; to operate a system of waterworks and to supply water to the city of Decatur and adjacent towns and villages and their inhabitants. The corporation's duration was fixed at fifty years. Its capital stock was divided into 99,900 shares of preferred stock of the par value of $10 per share, or $999,000 in the aggregate, and 100 shares of common stock without a par value. The charter provides that whenever cumulative dividends at seven per cent annually have been fully paid, the preferred stock may be retired at par by giving the holder fifteen days' notice by publication and mailing; that after two years no earnings available for the payment of dividends shall be disbursed for capital expenditures but must be used to pay dividends on or to retire preferred stock; that all sums realized from the sale of capital assets after that period shall likewise be applied to the retirement of preferred

stock, and that whenever all the preferred stock shall have been retired and the company's debts, except current expenses, fully paid, then, upon the assumption of the current expenses by the city of Decatur and the payment by it of $1000 to be distributed among the holders of the common stock, the corporation shall convey all of its assets to the city and be dissolved.

On February 28, 1921, the council of the city of Decatur passed an ordinance embodying the provisions and authorizing the execution on the part of the city of a contract with the water supply company. Shortly thereafter the company publicly offered its preferred stock for sale. An advertisement of the stock which appeared in the *Decatur Herald* of March 9, 1921, contained the following table:

"PREFERRED STOCK    7%    NON-TAXABLE

$1,000,000 authorized for sale and will be sold this week.
A real investment for real people.
We borrow a million dollars from ourselves and pay it back in 16 years. See how it works out.

|  | Income | Taxes of all Kinds | Expenses and Contingencies | Interest | Principal Paid |
|---|---|---|---|---|---|
| End of 1st year | $135,000 | $20,000 | $5,000 | $70,000 | $30,000 |
| " 2nd " | 135,000 | 20,000 | 5,000 | 67,900 | 42,100 |
| " 3rd " | 135,000 | 20,000 | 5,000 | 64,953 | 45,047 |
| " 4th " | 135,000 | 20,000 | 5,000 | 61,800 | 48,200 |
| " 5th " | 135,000 | 20,000 | 5,000 | 58,425 | 51,575 |
| " 6th " | 135,000 | 20,000 | 5,000 | 54,816 | 55,184 |
| " 7th " | 135,000 | 20,000 | 5,000 | 50,953 | 59,047 |
| " 8th " | 135,000 | 20,000 | 5,000 | 46,720 | 63,180 |
| " 9th " | 135,000 | 20,000 | 5,000 | 42,397 | 67,603 |
| " 10th " | 135,000 | 20,000 | 5,000 | 37,665 | 72,335 |
| " 11th " | 135,000 | 20,000 | 5,000 | 32,601 | 77,399 |
| " 12th " | 135,000 | 20,000 | 5,000 | 27,183 | 82,817 |
| " 13th " | 135,000 | 20,000 | 5,000 | 21,386 | 88,614 |
| " 14th " | 135,000 | 20,000 | 5,000 | 15,183 | 94,317 |
| " 15th " | 135,000 | 20,000 | 5,000 | 8,546 | 101,454 |

Balance to be paid during 16th year, $20,628
Then the completed improvement will be presented to the city."

Subscriptions rapidly followed and all the preferred stock was sold within a few days.

The contract between the city and the water supply company was dated and executed on April 4, 1921. It recited the city's possession of the waterworks, the inadequacy of its water supply, the construction of the new dam across the Sangamon river, the authorization of a bond issue for the dam's construction, the uselessness of the dam without acquiring lands for a reservoir and altering roads and building bridges, and the city's lack of the funds and credit required for those purposes. The contract also recited the existence of the water supply company, its financial ability to acquire the lands to be flooded and to make the improvements proposed, and its power to enter into a contract with the city to enable the latter to obtain an adequate water supply. The contract then provided by section 1 that the water company, in consideration of $35,000 to be paid by the city and of the profits to be derived from the undertaking, agreed to acquire either the land necessary for a reservoir or the right to flood that land; to clear the land to be flooded; to defend all suits and pay all final judgments for damages to land caused by impounding the water, and to pay the cost and expense of altering roads and highways, raising bridges, constructing new bridges, and of all other work necessary to maintain the water in the reservoir 612 feet above the sea level at the dam. The engagements of the water company were, however, limited to a total expenditure of $1,000,000. The city agreed, on its part, by the second section, to pay the water company $35,000 in cash on or before May 1, 1921; to complete the dam and to maintain it; to make provision for taking water from the reservoir by the construction of the necessary intakes; to pump water from the reservoir and to supply it through its mains to customers at reasonable rates to be fixed by the city. The right was reserved by the city to pump water for public purposes without charge.

By the third section of the contract the parties agreed that all water rents should be deposited in some bank to their joint account, to be withdrawn upon warrants executed by their proper officers; that out of such rents accruing and collected after May 1, 1921, the city should first be paid a sum equal to the expense incurred by it during the preceding month in the operation of the water system exclusive of the impounding dam and the reservoir, and that the remainder should be divided between the city and the water company in the proportions of ten and ninety per cent, respectively. The contract was to run for thirty years, but it provided that the water supply company might terminate the joint undertaking at any time after January 1, 1923, upon thirty days' written notice to the city, if the company's annual income did not equal $135,000 and the city refused to pay the deficit within thirty days after the written notice. It was further provided that in the event of the termination of the joint undertaking, the issuance of an injunction restraining the performance of the contract, or if the contract should be declared void in whole or in part or the company be prevented from receiving its proportion of the water rents to the extent of the minimum prescribed, the city was required, within five days, to open the flood gates of the impounding dam and to remove, if necessary, so much of the dam itself as with the opening of the flood gates would reduce the water in the river to its level before the construction of the larger dam, and in case the city failed in that respect the water company was authorized to do so.

Section 4 required the city's approval of all plans, specifications and contracts for any of the contemplated work and of the price to be paid in case of the acquisition, by purchase, of lands to be flooded. The public letting to the lowest responsible bidder of all contracts for labor or material involving an expenditure of more than $1000 was stipulated. The city had the right, at its expense, to have

an inspector upon all construction work done by or for the water company, and to have a representative present and heard at all directors' meetings of the company during the discussion or consideration of the purchase or clearing of land, the acquisition of water rights or the determination of plans and specifications for any work. The water company was required to proceed expeditiously in the performance of the contract on its part, to keep proper books and records of its transactions, to manage its business and properties safely and economically, and to allow the city access to its books and records at all reasonable times.

The fifth section of the contract provided that if for any reason sections 1 and 2 be declared void or the payment of money to the water company pursuant to any of the first three sections be enjoined or the joint undertaking be terminated on notice by the water company, the latter nevertheless granted the city the option to require the water company to observe the contract on its part upon payment by the city to the company, within thirty days allowed for the exercise of the option and within each succeeding thirty-day period thereafter, of a sum equal to eight cents for every thousand gallons of water pumped by the city during the preceding calendar month, the last of such successive thirty-day periods, however, not to extend beyond thirty years from the date of the contract. Each payment in advance automatically extended the rights of the city for the succeeding thirty-day period, but the city's failure to make any such payment terminated its rights. So long as the option was exercised, the water company, through its proper representatives, was given access to the records of the city to ascertain the quantity of water pumped by it and to determine the sum to be paid by the city from time to time. If the city should not renew its right for any thirty-day period, it would, upon written notice from the water company, open the flood gates of its impounding dam and remove, if necessary, so much of the dam itself as with the

opening of the gates would reduce the water in the river to its level at the time the contract was made. Failure on the part of the city to comply within thirty days after the service of notice, authorized the water company to enter upon the impounding dam, open the flood gates and remove so much of the dam as obstructed the flow of water.

By section 6 the water company gave the city the option, within thirty years, to purchase the company's interest in the joint undertaking and in the lands, property and rights acquired by it, at a sum sufficient to discharge its outstanding obligations, to retire its preferred capital stock, exclusive of any such stock issued as a dividend, at its par value, with the accrued dividend, and to pay the expenses of dissolving the water company, including $1000 to be distributed to the holders of the common stock, and upon the exercise of the option and the payment of the purchase price the water company was required to convey to the city, free from liens, all of its property and assets, save a sufficient amount to pay its obligations, to retire its capital stock in accordance with its charter and to wind up the corporation.

The city, by check dated April 4, 1921, paid the water supply company the sum of $35,000, as required by the second section of the contract.

The council of the city of Decatur on April 18, 1921, passed an ordinance fixing new water rates. These rates were substantially higher than the charges for like service which had been effective prior to that time.

In December, 1921, the water supply company had acquired all of the lands below the 615-foot level adjacent to certain streets and alleys above the dam which would be subject to overflow by impounding the maximum quantity of water. The city accordingly, by ordinance passed on December 22, 1921, vacated the parts of the streets and alleys so subject to overflow in order that they might be flooded as a part of the land constituting the reservoir.

From May 1, 1921, to April 30, 1922, the receipts from water rates amounted to $241,717.64. Out of this sum the city was first paid the cost of operating its waterworks, which amounted to $73,362.64. The city then received $16,835.46 and the company $151,519.54 as their respective shares of the proceeds of the joint undertaking. The company's share was gross, and it was obliged to deduct therefrom its taxes and expenses of operation under the terms of the contract in order to arrive at its net profits available for the payment of dividends.

Appellant's first contention is that the city of Decatur, at the time it entered into the contract with the Decatur Water Supply Company, was indebted beyond the maximum permitted by the constitution and that the arrangement was merely a scheme or device to evade the constitutional limitation. Section 12 of article 9 of the constitution provides: "No county, city, township, school district, or other municipal corporation, shall be allowed to become indebted in any manner or for any purpose, to an amount, including existing indebtedness, in the aggregate exceeding five percentum on the value of the taxable property therein, to be ascertained by the last assessment for State and county taxes, previous to the incurring of such indebtedness." (Smith's Stat. 1925, p. 50.) If the contract between the city of Decatur and the Decatur Water Supply Company creates an indebtedness beyond the limitation so fixed it is void. Undoubtedly that contract, in its main purpose, grew out of the city's need for additional facilities to supply its citizens with water throughout the entire year. Those facilities it was sought to provide by the construction of a larger dam and the acquisition of land for a reservoir. The city was, however, unable to pay for both of these improvements at the time. The city owned the dam, and although it might eventually acquire the reservoir site of the water company, it does not necessarily follow, under the terms of

the contract, that it will do so. The only absolute and fixed right under the contract is that of the city to flood the land of the water company for a certain rate of compensation to be paid out of the water rates derived from the consumers of water residing in the city. There is no showing by appellant that an indebtedness is or will be created by this method of paying the water company which exceeds or will exceed the constitutional limit for the city. No obligation is imposed upon the city to pay the water company's compensation. If in any given year the company should fail to realize as its share of the water rates the minimum prescribed by the contract no liability on the part of the city to pay the deficit would arise. The city might choose to pay the deficit, but if it refused to do so no suit to recover it could be maintained by the company. Moreover, the record affirmatively shows that the company received as its share for the first year under the contract a sum in excess of the minimum fixed. Nor did the payment of $35,000 to the water company when the contract was executed make it void. That sum was paid out of the city's current funds by check dated the same day as the contract. It was to all intents and purposes a cash transaction, and for that reason no indebtedness was created thereby. The burden of proof was upon appellant to show that the contract violates the constitutional limitation which he invokes. (*City of Carlinville* v. *Anderson,* 303 Ill. 247; *Bagdonas* v. *Liberty Land and Investment Co.* 309 id. 103.) That burden has not been sustained.

The next contention of appellant is that the contract is void because it violates separate section 2 of the constitution, which reads: "No county, city, town, township or other municipality, shall ever become subscriber to the capital stock of any railroad or private corporation, or make donation to or loan its credit in aid of such corporation." (Smith's Stat. 1925, p. 54.) The city of Decatur did not subscribe to any of the water company's capital stock. The

city lacked both the money and the credit to obtain the additional facilities necessary to supply water to its inhabitants. The payment of $35,000 and the vacation of the inundated portions of streets and alleys were considerations for the contract by which those facilities were provided. The share which the company receives out of the water rates is its compensation, at least in part, for water supplied or service rendered. The exchange of one thing for another does not constitute a donation or loan of the city's credit. *City of Chicago* v. *Pittsburg, Cincinnati, Chicago and St. Louis Railway Co.* 244 Ill. 220.

Appellant further insists that the city had no power to enter into the contract with the water company. Section 1 of the "act to enable cities, incorporated towns and villages to contract for a supply of water for public use, and to levy and collect a tax to pay for the water so supplied," (2 Callaghan's Stat. Ann. p. 1609,) provides that in any city where waterworks have been or may be constructed by any person or incorporated company, the city authorities may contract with such person or incorporated company for a supply of water for public use for a period not exceeding thirty years. It is immaterial that the city owns some of the equipment by which the water is supplied. The water company in the instant case owns the reservoir where the water is stored. The statute does not require that the water company or the individual shall possess complete facilities and the city have none. It would be anomalous if a city without equipment of any kind should be enabled to invoke this statute while a city partially equipped to supply water would be denied the benefit of its provisions.

Other contentions are that the contract is void because it was not submitted to a vote of the electors of the city and competitive bids were not required. Neither of these steps is necessary to consummate a contract for a supply of water for public use. Whether the statutory provisions are applicable if the city should decide to exercise its op-

tion to purchase the company's property need not now be considered.

It is finally contended by appellant that the contract is so unreasonable that it is void. The contract was executed, so far as the city was concerned, pursuant to an ordinance passed by the city council. If the ordinance is otherwise valid, the determination of the question whether it is reasonable and necessary is committed in the first instance to the municipal authorities. (*People* v. *Grand Trunk Railway Co.* 232 Ill. 292; McQuillin on Mun. Ordinances, sec. 181.) But it is argued, in effect, that if the terms of the contract are reasonable upon the basis of a contemplated purchase of the reservoir by the city they are necessarily unreasonable if they merely provide for a water supply from year to year without involving the acquisition by the city of the company's property. Figures are adduced to show that the city's net income from its water system prior to May 1, 1921, exceeded its share of the water rates under the contract. Appellees assert, on the contrary, that appellant in his calculations ignores the fact that under the contract the company's share is gross while the city's is net, and that the company out of its portion must pay taxes, salaries, corporate expenses, the cost of maintaining roads and bridges and other items. More complete facilities for insuring an adequate water supply may account for increased outlays and diminished returns. One who attacks a contract based upon an ordinance on the ground that the contract is unreasonable has the burden of establishing the charge. (*City of Chicago* v. *Washingtonian Home,* 289 Ill. 206.) We cannot say that the contract in question is so unreasonable in its provisions as to warrant our interposition.

The decree of the circuit court is affirmed.

*Decree affirmed.*