## No. 16,544.

McNichols, Auditor of the City and County of
Denver v. City and County of Denver et al.
(230 P. [2d] 591)

Decided December 11, 1950.   Rehearing denied April 30, 1951.

Mr. Ivor O. Wingren, Mr. Albert T. Frantz, for plaintiff in error.

Mr. J. Glenn Donaldson, Mr. Abe L. Hoffman, Mr. Malcolm Lindsey, Messrs. Pershing, Bosworth, Dick & Dawson, for defendants in error.

Mr. William A. Grelle, Mr. William L. Lloyd, Mr. Frederick T. Henry, amici curiae.

*En Banc.*

Mr. Justice Jackson delivered the opinion of the court.

July 27, 1948, the council of the City and County of Denver passed an ordinance (No. 106) providing for submitting to the qualified voters of Denver the question of acquiring and improving real estate in Denver and erecting improvements for use as off-street parking. Section 11 contained a recital that " * * * this ordinance is necessary for the immediate protection and preservation of the public health, safety, convenience and general welfare."

Section 3 of the ordinance posed the question to be submitted to the voters, as follows:

"Shall the City Council of the City and County of Denver by virtue of the authority vested in it by the Constitution of the State of Colorado and the Charter of the City and County of Denver authorize the issuance of the bonds of the City and County of Denver in the principal sum of $4,500,000.00 or so much thereof as may be necessary to be used for the purpose of providing funds for the acquisition and improvement of municipal parking facilities, including the acquisition of land and

the improvements thereon, such bonds to bear interest at a rate not exceeding four per centum per annum, to be subject to prior redemption at the option of the City and County of Denver on and after a date not later than ten years from the date thereof, to mature serially over a period not exceeding thirty years and to be payable from the revenues to be derived from the operation of said municipal parking facilities and secured by a conveyance in trust of the title to said facilities, said bonds to be issued in series, one series for each parking area to be designated by the City Council, and to be additionally secured, if in the judgment of the City Council it is necessary to make said bonds salable, by one or both of the following:

"(1) A pledge of revenues to be derived from street parking meters within the respective parking areas, or (2) Special assessments levied against benefited property within the respective parking areas."

At an election held September 14, 1948, 38,767 taxpaying electors voted in favor of the issuance of the bonds with 25,511 voting negatively. Subsequently, the manager of improvements and parks published a notice that Denver would consider proposals for the purchase of $3,700,000 Denver Parking Revenue Bonds. It was stated in the notice that, "Preference will be given to proposals for revenue bonds payable solely from the net operating earnings of the proposed Parking Facilities and additionally secured by a conveyance in trust of the title to said facilities."

The form of notice, period of publication, and the letters asking for proposals were not submitted for previous approval by the city council. Seven proposals were subsequently received, of which five were rejected, and the two most promising were given further study, from which it appeared that the proposal of A. C. Allyn and Company would be more favorable if the bonds were not called prior to maturity, whereas the bid of Otis and Company would be more favorable if the later maturing

bonds were called on their option date, April 1, 1960 instead of being allowed to run to their serial maturities covering the years 1961 to 1979, inclusive. The city council, by subsequent preliminary ordinance No. 86, accepted the Otis and Company bid; and May 16, 1950, after further negotiation with that company enacted ordinance No. 110 authorizing the issuance of "Off-street Parking Revenue Bonds" in an amount not to exceed $4,000,000.00.

Section 5 of the ordinance provided that the later maturing bonds are subject "to redemption in inverse numerical order, at the option of the City and County of Denver, on the first day of April, 1960, or on any interest paying date thereafter prior to maturity, at a price equal to the principal amount thereof, with accrued interest to the redemption date, together with a premium of two per centum of the principal amount thereof."

Section 6 provides that payment of each bond and the interest thereon shall be made solely from the revenues derived from the operation of the off-street parking facilities in the parking area No. 1 (described in the ordinance), and further recites that:

" * * * the City and County of Denver, as security for such payment, has pledged certain funds created by said Ordinance into which said revenues, after provision for all necessary and reasonable expenses of operating and maintaining said facilities, will be paid, all as set forth in said Ordinance and in the Trust Indenture, to which reference is hereinafter made. This bond and the series of which it is one are issued or are to be issued, pursuant to said ordinance and under and pursuant to the Trust Indenture of even date herewith by and between the City and County of Denver and The Colorado National Bank of Denver, as Trustee, an executed counterpart of which is on file at the office of the Trustee in the City and County of Denver, State of Colorado. Reference is hereby made to the Trust Indenture for the provisions, among others, with respect to the conveyance in

trust of the title to the offstreet parking facilities in Parking Area No. 1, with respect to the custody and application of the proceeds of bonds issued under the Indenture, the collection and disposition of revenues, the funds charged with and pledged to the payment of the interest on and the principal of the series of bonds of which this is one, the nature and extent of the security, the terms and conditions on which bonds are or may be issued, the rights, duties and obligations of the City and County of Denver and of the Trustee, and the rights of the holders of the bonds, and, by the acceptance of this bond the holder hereof assents to all provisions of the Trust Indenture."

When the auditor was requested to affix his signature to the bonds and the trust indenture, without which neither would be effective, he refused, basing his refusal upon various grounds some of which are herein later discussed. Thereupon the city, its mayor, and its manager of improvements and parks brought suit to compel the auditor to sign the bonds and trust indenture.

After a trial to the court, the latter held that the auditor's duty in countersigning the bonds and trust indenture was a ministerial act, and that he had no discretion in the matter; that the bonds and trust indenture were legal; and that the ordinances which he challenged were valid exercises of the legislative power. The auditor was ordered to countersign the various instruments. He seeks reversal here, filing eleven specifications of error; in none of them, it should be noted, does the auditor contend that Denver has not the power to acquire property for off-street public parking facilities as a proper exercise of the police power. *City and County of Denver v. Henry,* 95 Colo. 582, 585, 38 P. (2d) 895; *McSorley v. Fitzgerald,* 359 Pa. 264, 59 A. (2d) 142; *Miller v. City of Georgetown,* 301 Ky. 241, 191 S.W. (2d) 403. The area of his argument is that the ordinances and proceedings in the instant case are void and ultra vires.

We discuss the specifications which we believe support the auditor's contention.

▇▇▇ (1) One of the specifications which we believe has merit and warrants reversal of the trial court's judgment is that the title to the off-street parking facilities is covered by a mortgage or trust indenture running to a private trustee. It will be noted that the bonds are described as "revenue bonds" and their validity is urged on the theory that both principal and interest of the bonds are to be paid "solely from the net operating earnings of the Proposed Parking Facilities." When, however, the off-street parking properties, after being acquired by the city, are mortgaged under a trust indenture to secure payment of the bonds, then the bonds by that very act become more than revenue bonds— they become mortgage bonds; and when the city mortgages its property to secure a bonded indebtedness, it follows that a debt has been created within the meaning of a constitutional provision limiting the amount of municipal indebtedness.

In Florida a similar result seems to have been reached in *Brash v. State Tuberculosis Board*, 124 Fla. 167, 167 So. 827, involving a proposed loan by the state board from the federal government. It was proposed that the state should issue interest bearing certificates to the federal government, not enforceable against the state of Florida other than the income and revenue pledged. The certificates were further secured by mortgage upon the property purchased, without there being a direct pledge of the credit of the State of Florida to repay. The Florida court's disposition of this situation was as follows: "If as proposed by gift and loan from the Federal Government, land is acquired by the State Tuberculosis Board, upon which to erect a State Tuberculosis Sanatorium, such land will become the property of the State; and if a mortgage is executed upon the land and the improvements and betterments thereon, and upon all fixtures, furniture, and equipment affixed to or located on

the mortgaged property as contemplated by the resolution of the State Tuberculosis Board, such mortgage will be an express contract lien and charge upon the corpus of the property of the State, with an express agreement by the Board that such mortgage shall be subject to foreclosure and other remedies to enforce the payment of the loan. It would, in effect, be an attempt to create a binding continuing interest-bearing contract obligation of the State to pay money in the future to be enforced by subjecting property of the State to such payment, in violation of the intent of Section 6, Article IX of the Florida Constitution."

Illinois cases present a varied state of facts bordering on this situation from *Schnell v. City of Rock Island,* 232 Ill. 89, 83 N.E. 462, 14 L.R.A. (N.S.) 874, and *City of Joliet v. Alexander,* 194 Ill. 457, 62 N.E. 861, through *Hairgrove v. City of Jacksonville,* 366 Ill. 163, 8 N.E. (2d) 187. In *Poole v. City of Kankakee,* 406 Ill. 521, 94 N.E. (2d) 416, which appears to be the most recent case, the court makes the following analysis of preceding Illinois cases in the following paragraph from which it would seem that it still makes a distinction between the pledge of income from facilities (whether existing or to be acquired) and the pledge or mortgage of municipal property, including the pledge or mortgage of the facilities themselves: "Relying on the cases of *City of Joliet v. Alexander,* 194 Ill. 457 [62 N.E. 861], and *Schnell v. City of Rock Island,* 232 Ill. 89 [83 N.E. 462, 14 L.R.A., N.S., 874], where it was held that the mortgage of existing property and income created a debt which put the cities there involved beyond their constitutional debt limit, appellees urge that the pledge of revenues from existing meters is invalid on the same general principle involved in the cited cases, because the city of Kankakee will be deprived of the use of such revenues for other purposes. Such argument ignores the modification of those cases contained in *Maffit v. City of Decatur,* 322 Ill. 82 [152 N.E. 602], *Ward v. City of Chicago,* 342 Ill.

167 [173 N.E. 810], and *Simpson v. City of Highwood,* 372 Ill. 212 [23 N.E. (2d) 62, 124 A.L.R. 1459], where it is stated that where no property of a city is pledged to secure payment of an indebtedness, it does not violate the constitutional debt limitation to pledge the revenues both from the facility being extended and from the extension. In the instant case no attempt is made to pledge or mortgage any city property, thus, if the principle has any application at all, under the rule of the last-cited cases, the pledge of income from existing facilities does not render the ordinance invalid."

In oral argument counsel for the city stated that the indebtedness of the City and County of Denver had so nearly reached its legal limit that the off-street parking bonds were made revenue bonds so as to avoid any question of their causing the city to exceed its debt limit. We are not advised, either by oral argument or record, as to the extent the amount of the off-street parking bonds, when added to the amount of the other outstanding bonds of the city, would exceed the legal debt limit. Counsel on both sides seem to agree that the excess would not be large, but that fact does not justify overlooking that phase of the matter. What we here emphasize is that the off-street parking bonds, unlike bonds relying *solely* upon revenues for their payment, do in fact increase the outstanding indebtedness of the City and County of Denver. *Shields v. City of Loveland,* 74 Colo. 27, 218 Pac. 913. The distinction can be seen by what happens in the event of default. The recourse of the holder of the revenue bonds continues to be the right to the revenue from the facility; the holder of the mortgage bond, however, can foreclose on the physical assets under the mortgage and to that extent render the city that much poorer by becoming possessed of its property that has been mortgaged. Counsel for the city greatly emphasize the fact that these off-street parking bonds are revenue bonds, that the ordinances so describe them, and that in each bond reference is made to its

being a revenue bond. We do not doubt that under the provisions of both the ordinance and the mortgage to the private trustee the revenues from the facilities are to be devoted to payment of the principal and interest of the bonds. If the bonds in question were *solely* revenue bonds *Shields v. City of Loveland, supra,* is authority to the effect that they could be considered not to have increased the indebtedness of the city. But when the city consents to mortgage its assets to secure the payment of its debt, the bonds become more than mere revenue bonds and, for the reasons stated, must be deemed to have increased the outstanding indebtedness of the city. Their payment can be enforced not merely by applying revenues thereto, but by the appointment of a receiver and the foreclosure of the city's capital assets.

We recognize a distinction is sometimes made between a case where the proceeds of the mortgage are used in the purchase of the facility and where the mortgage covers other property of the municipality. See, annotation beginning at 146 A.L.R. 328. The pledging of property to be purchased exposes to foreclosure, in the event of default, only the property thus being purchased, and it is argued that the city is no worse off from a balance sheet standpoint than when it started if it should lose the facility by foreclosure. This argument assumes no application of other municipal funds, either in expenses of purchase, maintenance, operation, or attempts to save from foreclosure. But even in that case the city is not in the secure position of the issuer of a bond payable solely from revenues, as in *Shields v. City of Loveland, supra,* where the facility being acquired can never be lost by foreclosure and where the municipal obligation is limited to so operating the facility as to service the revenue bonds. The line must be drawn at some point, and we believe it should be drawn so as not to include mortgaging of municipal property, whether already owned or hereafter acquired. We take judicial

notice of the fact that the great preponderance of revenue bonds actually issued are of the latter type.

Subsequent to our opinion in *Shields v. City of Loveland, supra,* the federal court (8th Circuit) in *Franklin Trust Co. v. City of Loveland,* 3 F. (2d) 114, through Judge Robert E. Lewis, with a similar question before it, stated: "There is no ground for a claim that the bonds are to be a lien on the plant, or that the holders could look to the plant for their payment; nor can general taxation be resorted to for that purpose. The opinion of the State supreme court can mean nothing else."

Subsequently, in *In re Senate Resolution No. 2,* 94 Colo. 101, 131, 31 P. (2d) 325, both majority and dissenting opinions cite *Shields v. City of Loveland, supra,* the dissenting opinion quoting the foregoing federal court's interpretation of that case.

It thus appears needless to consider the question of whether Denver has power to mortgage its capital assets when the trust indenture to the private corporate trustee has the effect of increasing the indebtedness of the city to a point beyond the debt limit. Even if the debt limit has not been reached, there would still seem to be a *contradiction in terms* in a bond that stated it was payable as to both principal and interest solely out of the revenues of the facility and at the same time contained a provision that it was secured by a mortgage or trust indenture covering certain assets of the city. The execution of such a mortgage conflicts with the expressed intent of the bonds and the ordinance, and of what counsel for the city say was the purpose of issuing the bonds.

(2) Another specification is that the execution of a mortgage by the city to a private trustee invades some of the functions of the treasurer and auditor and is contrary to the provisions of the Denver charter.

Sections 301, 305, 403 and 404 of the indenture running to the private trustee provide for the setting up of special funds, their investment in some cases by the private trustee, upon the direction of the Manager of

Public Improvements and Parks, and the paying out of funds by the trustee as directed by requisitions. The holding and handling of the funds are vested in the private trustee. The auditor urges that the foregoing arrangements violate section 102 of the Denver charter which contains the provision that, "no moneys shall be paid out by the treasurer for any purpose except upon warrants drawn upon him by the auditor, unless otherwise provided by this Charter. * * * "

The auditor further argues that the arrangement set up with the private trustee violates section 108 of the charter which, in part, provides: "All moneys arising from taxes, licenses, fees, fines, penalties and forfeitures, and from any source whatsoever, which may be collected or received by any officer of the city and county, or any department thereof, in his official capacity, for the performance of any official duty, *shall be paid into the treasury*. No officer or person other than the treasurer shall pay out or disburse such moneys or any part thereof, except as herein otherwise provided." The auditor also refers to section 139 of the charter detailing his duties. We agree with him that the provisions of the indenture to the private trustee do invade his powers and duties, as well as those of the treasurer, and that a portion of them have been shifted to the private trustee which, incidentally, is allowed to charge reasonable fees for services that it would seem the auditor and the treasurer are paid to perform.

█ It would seem that the mechanism of a trust indenture running to a private trustee, giving the latter power to hold the title to both property and funds, is not contemplated by the charter of Denver which provides the mechanisms more familiar in public government giving to the treasurer and the auditor of the city the power and duties which the proposed trust indenture in part undertakes to bestow upon the private trustee.

(3) The auditor contends that the premium of 2% that must be paid, in addition to the face amount of the

bonds, if those bonds maturing after 1960 are called prior to maturity, is unauthorized and invalid. We do not agree with him that the 2% premium has the effect of exceeding the maximum interest of 4%. The bonds carry 3% and 3⅝% coupons, depending upon their maturity. Interest is a continuous annual payment; the premium is paid but once. If it were to be treated as interest, its payment at the earliest call date, 1960, would have to be spread over ten years, or at the rate of two-tenths of 1% a year. This amount, added to the face of the interest coupons, would not make a total interest payment of 4% annually.

But we are inclined to agree with the auditor that, where a right of redemption prior to maturity is reserved by a municipality, unless there is authorization for the payment of a specified premium, the right of redemption must be assumed to be made at par, i.e.: the face amount of the obligation. In the proceedings in question no reference is made to a premium charge. We believe the taxpaying electors, who voted in the election, had a right to assume that earlier redemption of the bonds would be at par. It is argued that this point need not concern the court at this time because the bonds may never be redeemed prior to maturity, in which case the question would not arise. We note, however, that the city has elected to award the bonds to the bidder which made the more favorable bid on the contingency that the bonds would be redeemed prior to maturity and the less favorable bid if the bonds were allowed to run to maturity; also the city takes the position that it accepted the bid most favorable to itself. This can only be, if the bonds are redeemed prior to maturity. We therefore think it pertinent to resolve the matter now.

(4) Another specification involves the question of whether the method of sale of the off-street parking bonds was valid. The city admits, in its brief, that the sale was in essence a private sale, but claims at the same time that there was free competition among a number of

bidders. The auditor claims the sale was unlawful because it was not a public sale at which all competitors were bidding on the same specifications. We reserve ruling on this point, inasmuch as the judgment of the trial court is being reversed on the three grounds already stated. In any future sale of the bonds, the necessity for deciding this question may be obviated.

The judgment is reversed.

MR. JUSTICE MOORE not participating.