## No. 16,870.

BRODHEAD, MANAGER OF REVENUE, ET AL. *v.*
CITY AND COUNTY OF DENVER ET AL.
(247 P. [2d] 140)

Decided July 21, 1952.

Mr. Ivor O. Wingren, Mr. Albert T. Frantz, for plaintiffs in error.

Mr. Leonard M. Campbell, Messrs. Pershing, Bosworth, Dick and Dawson, for defendants in error.

*En Banc.*

Mr. Chief Justice Jackson delivered the opinion of the court.

The City and County of Denver brought this action for a declaratory judgment against its treasurer and auditor following their refusal to approve the issuance of $4,000,-000 of off-street parking bonds. The judgment of the trial court being in favor of Denver, the treasurer and auditor bring the cause here by writ of error seeking reversal of the judgment.

The case had its origin in the approval in an election held September 14, 1948, of ordinance No. 106, referred to the qualified electors by the city council. This ordinance provided for the installation of a system of off-street parking and its financing. Following a favorable vote on this ordinance by the qualified electors, its validity and the subsequent proceedings taken by the city were attacked by the auditor, and certain objections raised by him were sustained by our court in the case of *McNichols v. Denver*, 123 Colo. 132, 230 P. (2d) 591, in which the ordinance and proceedings are recited at more length. Following this decision the city council, with the purpose of removing the objections which we raised, enacted a new ordinance, No. 269, on December 20, 1951, and an amendment of 1952. These eliminated the optional provision for a call prior to the maturity date of the proposed off-street parking bonds at a premium in-

stead of at par. Provision was definitely made for the sale of any new bonds at public sale, we having reserved the question as to the validity of the sale of the bonds under the former ordinance at what was admitted to be virtually a private sale.

Also there was eliminated from the new ordinance the provision present in the earlier ordinance for securing the bonds by a trust deed running to a private trustee conveying the facilities to be acquired. This feature we held invalid in that it invaded functions of the auditor and treasurer as provided in the Denver charter. We also stated that the provision for mortgaging the facilities, which included power of foreclosure in the trustee in the event of default, made the bonds mortgage bonds and not merely revenue bonds payable solely out of the revenues of the facilities.

The new ordinance of 1951 appears, therefore, to have eliminated the features which we held in *McNichols v. Denver, supra,* rendered certain provisions in the earlier ordinance and the proceedings thereunder either outright invalid or in some respects questionable.

One of the principal attacks by the treasurer and auditor, aimed at the 1951 ordinance, is based on the ground that the elimination of the provision for the conveyance of the facilities to be acquired by Denver to a private trustee as additional security for the bonds so altered the nature of the bonds, the issuance of which the voters approved in the 1948 election, that a fatal variance occurred when they were not secured by a mortgage on the facilities. The 1951 ordinance contained a provision for the principal and interest of the proposed bonds to be payable from the revenues of the off-street parking facilities to be acquired and provided, as additional security, the revenues from the on-street parking meters within the area.

We agree with the trial judge that the fact that the voters authorized the mortgaging of the facilities in the 1948 ordinance—a provision which we held to be in-

valid—does not prevent the issuance of bonds unsecured by a mortgage on such facilities. The purpose of a mortgage is to give the creditor additional protection or security for the loan he is making to the debtor. But a creditor may, and often does, make a loan without the taking of a mortgage on the property of the debtor; he may waive the giving of such security. So here, if Denver can negotiate this loan without mortgaging its off-street parking facilities, thus avoiding the possibilities of such properties falling into the hands of the bondholders through the process of foreclosure, it would seem that the elimination of this provision would be a benefit and not a detriment to the city. It was a provision which Denver was *authorized* but not *compelled* to use; it, therefore, is severable, and its insufficiency does not void the whole proceeding. *State v. Salt Lake City,* 35 Utah 25, 99 Pac. 255.

In the briefs in the former off-street parking case, *McNichols v. Denver, supra,* it was argued that the electorate thought it was voting for merely revenue bonds because of the large caption on the question submitted which so described them. The 1951 ordinance, it seems to us, provides for just such revenue bonds as those for which both parties in their former briefs stated that the electors thought they were voting. There is no showing that the voters were misled. *Allison v. City of Phoenix, et al.,* 44 Ariz. 66, 33 P. (2d) 927, 93 A.L.R. 354; *Keigley, et al. v. Bench, City Recorder,* 97 Utah 69, 89 P. (2d) 480, 122 A.L.R. 756; *Anselmi, et al. v. City of Rock Springs, et al.,* 53 Wyo. 223, 80 P. (2d) 419, 116 A.L.R. 1250.

It is argued that the 1951 ordinance has added as additional security for the bonds a pledge of the revenues from the on-street parking meters from the areas surrounding the off-street parking facilities; that these revenues now fall into Denver's general fund, and their diversion to the servicing of the off-street parking bonds will to that extent deplete the general fund of the city. That is a question that goes to the wisdom of the meas-

ure and not to its validity. To determine its validity would be the function of the court, but it has often been pointed out by this and other courts that it is not the function of courts to sit in judgment on the wisdom of legislation. This court might be unanimous in agreeing that this ordinance was unwise and yet must uphold its validity if the attack on it relates solely to its unwisdom. Here the 1948 ordinance approved by the electorate expressly authorized the pledging of the revenues from the on-street parking meters located in the specific areas. It is to be here noted that the ordinance of 1951 does not obligate Denver to maintain parking meters in such areas. It is only the revenues from such parking meters as may, during the life of the bonds, be maintained in the areas, that are pledged. If the Denver officials should see fit to abandon parking meters in the specified areas during the life of the proposed bonds, there would be nothing to prevent it.

It is argued that the city had no right in the 1951 ordinance to pledge the revenues from the off-street parking operations. The portion of the question voted on in 1948 dealing with this reads as follows: "The bonds to be payable from the revenues to be derived from the operation of said municipal parking facilities and additionally secured by a conveyance in trust of the title to said facilities."

It is apparent that the first and principal thought in the proposition is the dedication of the revenues from the off-street parking to the servicing of the bonds. This is the primary security for their payment. It was only after the allocation of these revenues to the payment of the bonds that the clause "and *additionally secured* by a conveyance in trust of the title to said facilities," was subsequently added.

█ The electorate clearly gave the council power to earmark, set aside, or pledge the revenues from the facilities for the purpose of paying off the principal and interest of the bonds. In fact this revenue was the first

"security" mentioned for these bonds. It was the reason for their being designated "revenue bonds." The mandate of the electorate thus compels the treasurer to set up a special fund into which all the revenues from the operation of these facilities shall be paid and out of which payments of principal and interest on the bonds shall be made until the liquidation of the bonds is completed. The pledging of the revenues from this operation therefore is a *limitation* on their use to the one purpose of servicing the bonds. The city has voluntarily surrendered the use of this income for any other purpose.

The pledging of the *income* from the facilities is quite a different thing from conveying the facilities themselves to a private trustee as additional security for the debt. As we pointed out in *McNichols v. Denver, supra,* the latter contemplates, through the process of foreclosure, the possible loss by the city of its capital assets, whereas all that the holders of the proposed revenue bonds can look to for payment is the revenues from the off-street parking facilities and those from any on-street parking meters that may be located within the prescribed area.

Another objection raised against the ordinance is that Denver may not legally acquire land already devoted to off-street parking. We see no legal bar to this procedure. In *Public Service Co. v. City of Loveland,* 79 Colo. 216, 245 Pac. 493, we approved condemnation by a city of properties of a utility company furnishing water or light and power, where the city was acquiring the property with intention of furnishing the same service. From an economic standpoint it would appear more advantageous to acquire property with no improvements located on it; there being then merely the value of the land for which the vendor can ask compensation. Furthermore, the stipulation signed by the litigants includes the following paragraph: "(e) The city officials also propose at some future time to erect structures on part of the property so acquired by the city and now used as

open off-street parking lots, and thereby increase the capacity of said off-street parking facilities."

It also is questioned whether the issuance of the bonds for the purpose of acquiring parking facilities is the issuance of bonds for a public and municipal purpose.

The Denver City Council has declared the issuance of the bonds is for such a municipal purpose. Ordinarily a legislative declaration to such effect is given great weight. *Wayne Village President v. Wayne Village Clerk* (Parr v. Ladd), 323 Mich. 592, 36 N.W. (2d) 157, 8 A.L.R. (2d) 357, and following annotation page 373. We have been supplied with no grounds for overthrowing this legislative finding and declaration, and especially when it comes from a municipality possessing the powers granted by the "Home Rule Amendment," namely Article 20 to the Colorado Constitution.

It is argued that the bond ordinance is discriminatory and conflicts with provisions of the charter relating to public improvements. It is urged that the plan will especially benefit the downtown retail area, and that the proper method of financing should have been through the creation of a special improvement district and the issuance of special improvement bonds. That this might have been an alternate method of financing is not gainsaid; it also is true that the off-street parking project could have been financed by general obligation bonds of the city. Probably most municipal improvements when financed by general obligation bonds are open to the criticism that the proposed improvements confer a larger benefit on the district in which the improvements are being installed than upon the rest of the community, such as where a city issues general obligation bonds to pave its business and retail district. That, however, does not lessen the fact that such an improvement benefits the whole community, and the project thus falls properly into the classification of being for a public and municipal purpose.

In later years the use of revenue bonds has been

expanding. In the case of such bonds it is not so important to determine whether the incidence of taxation should fall upon the community as a whole or upon the district in which the improvements are being erected because the legal burden of servicing the revenue bonds falls upon neither class of taxpayer but upon the user of the facility being installed, whether it be a water system, a light and power system, a municipal transportation system, a toll-road system, or an off-street parking system. The user is the one who pays for the system. In the case of the last three classes of facilities, the users may be from widely scattered localities, and there is no compulsion on the users to use them. Discrimination cannot be said to thrive on such a soil. Neither do we believe such an arrangement conflicts with the charter provisions relating to public improvements.

There remains the question whether this proposed financing bargains away the police power. We do not think so. The pledge of the revenues from the on-street parking meters, as we have noted already, relates only to those parking meters that may at any time be maintained within the area specified, with no obligation on the city to maintain parking meters if the city should at any time see fit to discontinue them.

With respect to the off-street parking facilities, the city agrees to maintain the facilities during the life of the bonds—the longest maturity being 1981—but should it desire to sell the facilities at any time, or the property on which the facilities are located, it has the privilege of calling the bonds on or after December 1, 1961 at par. Even from a technical standpoint, therefore, its mobility of action remains essentially unimpaired.

The judgment is affirmed.

MR. JUSTICE HOLLAND dissents.

MR. JUSTICE HOLLAND dissenting.

For many reasons I cannot concur in the affirmance

of the judgment of the trial court and I dissent from the majority opinion, which I will herein later discuss.

The validity of the bonds here involved cannot be upheld under the ruse that the present bond issue was authorized by the vote of the properly advised public. It is not disputed that the entire underlying project is an exercise of the police power. Let us not be lead astray from the fundamental and undeniable principle, thoroughly established, that the police power is to be exercised for *public benefit* and not for *revenue.* This power cannot be abdicated, neither can it be contracted or bargained away, neither can its free exercise be suspended by any artifice designed to make the purchase of a bond issue attractive. I regret that my observations, gathered from a study of the entire transaction, beginning with the original question submitted to the people, followed by the first ordinance and the proposed issue thereunder, rejected by this court, and the present proposed issue based on an assumed authority of the council under the original question submitted to the people, reveal that Denver has unwittingly lent itself to proceedings for the purpose of inducing ill-advised voters to sanction, and prospective bond purchasers to rely upon illegal security, when in law and in fact the result can be only a highly moral obligation. The coupons, delivered as a part of the bonds, are declared to be the lawful obligation of the city according to the tenor thereof. The tenor signifies the true meaning of the matters therein contained.

To avoid the charter limitation of the city's power to incur indebtedness, the city relies upon the following exception contained in section 250 of the Charter of the City and County of Denver: "* * *, there shall not be included within the estimate bonds issued for the acquisition of water, light, or other public utilities, works or ways from which the city and county will derive a revenue." This clearly indicates utilities or "works or ways" that are or may be a part of a municipal or governmental function, and does not, and could not, involve the exer-

cise of police power for revenue. Section 259, Charter of the City and County of Denver.

Let us take a look at the original question submitted to, and favorably voted upon, by the voters on September 14, 1948, which is as follows:

"Shall the City Council of the City and County of Denver by virtue of the authority vested in it by the Constitution of the State of Colorado and the Charter of the City and County of Denver authorize the issuance of the bonds of the City and County of Denver in the principal sum of $4,500,000.00 or so much thereof as may be necessary to be used for the purpose of providing funds for the acquisition and improvement of municipal parking facilities, including the acquisition of land and the improvements thereon, such bonds to bear interest at a rate not exceeding four per centum per annum, to be subject to prior redemption at the option of the City and County of Denver on and after a date not later than ten years from the date thereof, to mature serially over a period not exceeding thirty years and to be payable from the revenues to be derived from the operation of said municipal parking facilities and secured by a conveyance in trust of the title to said facilities, said bonds to be issued in series, one series for each parking area to be designated by the City Council, and to be additionally secured, if in the judgment of the City Council it is necessary to make said bonds salable by one or both of the following:

"1. A pledge of revenues to be derived from street parking meters within the respective parking areas, or 2. Special assessments levied against benefited property within the respective parking areas."

It is reasonable to presume that the uninformed voter was induced to vote favorably on the question when he believed that the parking facilities acquired and the revenue therefrom secured by a mortgage thereon was the integral part of the proposition from a self-sustaining standpoint. Did he know, or was the question raised,

that he could not instruct and authorize the city to further bargain away its police power? Neither the city council, nor this court, with any degree of certainty, can answer this question otherwise.

When the validity of the first proposed issue of bonds was disapproved by this court in the case of *McNichols v. Denver*, 123 Colo. 132, 230 P. (2d) 591, on the ground that the bonds proposed under this question submitted to the people were, in fact, mortgage bonds and would amount to an increase in the city's indebtedness, does it not clearly then appear that the question submitted to the voters contained an ultra vires promise or inducement? The vote of the people must be upon a question which in its entirety proposes a legal purpose and not encumbered by an inducing proposal that is unlawful and cannot be carried out. As the matter now stands, any other proposal or question therein submitted was aided by the combination of an unlawful proposal.

With the adverse decision of this court before them, wherein the question of pledging of property to be purchased was exposed to foreclosure, and that a foreclosure would leave the city no worse off than when it started, this court used the following language, "This argument assumes no application of other municipal funds, either in expenses of purchase, maintenance, operation, or attempts to save from foreclosure. * * * The line must be drawn at some point, and we believe it should be drawn so as not to include mortgaging of municipal property, whether already owned or hereafter acquired." Why did not the city then, in the interests of safety and security for itself and the prospective bond purchaser, provide for and call another election wherein the clear-cut proposal, within legal limits, be propounded to the voters? Instead, the city and its council, knowing that the people voted for a debt to be secured in an illegal way, saw fit to disregard the ultra vires provision and sought by the present ordinance authorizing the present bond issue, to broaden the question voted on by the people.

The plans proposed in the question submitted to the people were to the exclusion of any other plan and each of the plans submitted were inter-related and dependent upon the main question of security. In this particular kind of a matter, the powers of the city council must come from the people.

It is not within the province of the city council to direct that under the police power the city can institute "works and ways" from which it will derive a revenue and at the same time bind the police power of Denver to continue the operation of the parking facilities so long as any bonds are outstanding. In the last analysis, police power is no more nor less than the power to govern. It is easy to determine where it begins, but difficult to ascertain where it terminates. However, there are certain barriers which it cannot surmount. Such a barrier is the field of taxing power, from which the police power is forbidden. The taxing power is exercised for the raising of revenue subject to limitations, while a police power is exercised only for the promotion of public welfare, and this may be accomplished by taxing or licensing certain businesses or occupations, however, the sole purpose of the taxing and licensing must always be for regulation and not the raising of revenue.

It may be said that whatever is proposed to be done here was authorized by the people and no mortgage of the assets of the city is proposed. That does not answer the moral, if not legal, obligation of the city on its so-called "pledge" of its other assets, that being the revenue from on-the-street parking meters already acquired, owned and in operation by the city producing a revenue which goes into the general fund, which in turn should lessen property taxation and if extracted by this devious method from the general fund, will have to be replaced by other forms of taxation which may include a real property tax. Beyond all of this, the granting of pledges on public property, real or personal, is *against public policy*.

As hereinbefore stated, the police power is to be exercised for public benefit and not for revenue. Any revenue obtained from its exercise is presumably for the actual expenses or regulation of the project licensed or permitted under the power. The fact that there is many times an excess flowing from the fees and exactions from the exercise of the police power, which ultimately finds its way into the general fund, does not justify the exacting from the public excessive fees under this guise, when in fact it is designed to raise revenue. In the first place, if the city had any right to exercise its police power for revenue and could, by the means here proposed, take the revenue from its on-the-street parking meters, its already established property, then it would be equally within its power to pledge the funds derived from all other activities regulated and licensed by and under the police power. It is thus apparent that by the same plan here proposed and not promulgated by the city, it could lead to a pledging of all of these various funds as the security for debts unlimited and result in a direct evasion of the constitutional and charter limitations.

Specifically aside from, but indirectly related to, the questions before us, I might make the observation that I am not wholly in harmony with the proposition that under the guise of the police power, the city can designate a space of the city street dedicated to the public use, and rent it to an automobile driver for a nickel an hour to augment its general treasury. By these processes, we witness the evolution of the exercise of police power for public benefit into a revenue-producing power.

Can it logically be contended that by the ordinance now before us, there is not a surrender of the police power? It surely is an ineffective attempt to do so; however, the police power remains the same. To illustrate, the moment all of the bonds thus promoted by the city are sold and delivered, no human agency can prevent the immediate operation of the police power by abandonment of all parking facilities, the abolishment and re-

moval of parking meters, and by prohibiting all parking in the area described, either on or off-street. Therefore, the pledge and obligation of the city to maintain the off-street parking facilities while any bonds are outstanding is not worth a nickel legally.

I again say that neither the people, the city or its council can contract, barter or bargain away the necessary and ever-present, over-all police power, and again emphasize that under no guise or ingenious process can this all-important power be exercised for revenue purposes. Were it otherwise, such ruthless inhibitions could be imposed to meet unconscionable demands, that the freedom to enjoy our customary rights would be obsolete.

My concern, in this instance, is not for the city, but for the citizen and taxpayer and the prospective bond purchaser. If the project here fails for lack of revenue, or the city exercises its police power to the end that the contemplated sources of revenue are abolished, then the city does not lose financially; however, the city's credit standing would be impaired because the city could not absolve itself from failure to keep and enforce a promise which induced the investment of people's money. After all else is said, the so-called pledges here involved are no more or less than unenforceable promises, from a legal standpoint.

The majority opinion in discussing the elimination of the original mortgage provision by the city council, says that "It was a provision which Denver *was authorized* but not *compelled* to use." (Emphasis supplied.) In view of the fact that any authority of the council to act in this matter must come from the voters, its authority therein is thereby limited to the question voted upon by the people. The question taken into consideration by the voter contained certain combined conditions, one of which was as follows: "* * * and to be payable from the revenues to be derived from the operation of certain municipal parking facilities *and* secured by a conveyance in trust of the title to said facilities." This proposi-

tion is not severable, and the voters have the right to assume that in the event revenues from the facilities were inadequate, by use or foreclosure of the physical property itself would lessen the deficiency and leave the taxpaying voter with less possible liability.. This combined ultra vires provision invalidates the entire matter. The majority opinion further states that should the city desire to sell the facilities at any time, or the properties on which the facilities are located, it has the privilege of calling the bonds at par on or after December 1, 1961. If the police power should be exercised in the meantime, abolishing the off-street parking facilities, as well as the on-street parking meters, where would the money be obtained to retire the bonds if called? The majority opinion admits of this possibility when it says, "If Denver saw fit to abandon parking meters in the specified areas during the life of the proposed bonds, there is nothing to prevent it."

As to the question raised against the ordinance that Denver may not legally acquire land already devoted to off-street parking, reference is made in the majority opinion to the case of *Public Service Company v. City of Loveland,* 79 Colo. 216, 245 Pac. 493, which approves condemnation of utility property for municipal purposes. That is in a different field entirely and is not an exercise of police power. Such is a municipal or governmental function. I fail to see how the acquirement of land already devoted to off-street parking will lessen the parking hazard or problem. It results in nothing but a change of ownership in the property with a resulting loss of taxes thereon. The bare proposal or suggestion is neither helped nor cured by the quoted stipulation of the litigants to the effect that the city officials propose at some future time to erect structures on part of the property to increase the capacity. That these facilities are a local improvement is freely admitted, and it is recognized by the litigants that all the property within the area would be benefited. That the property so benefited would be

burdened with special assessments for the retirement of the bonds proposed is another part of the combined questions submitted to the voters, because a reading of the questions as hereinbefore set out, reveals that in order to make the bonds salable, one of the provisions was "special assessments levied against benefited property within respective parking areas." When the voter not being a property owner within the area described, realized that the property benefited would help, by special taxation, to bear the burden of the bonds, thus further relieving him of possible liability, it is only natural to think that if his vote was "yes" on the proposal, that it was influenced by this special assessment on local improvement provision. It is impossible to conceive of how this provision could be carried out except by the creation of a local improvement district as provided in the charter. However, the ordinance which proposed the submission of the questions to the voters has the effect of doubtfully leaning both in the direction of a local improvement and otherwise. The ordinance and the question does relate to local improvements and the declaration is made "that the improvements are a local necessity specially benefiting certain property."

The reference in the majority opinion as to whether or not the incidence of taxation falls upon the community as a whole or upon the district in which the improvements are erected, it is said that it is not necessary to determine that question, because the burden of servicing a revenue bond falls on the user of the facility. If this was ultimately true in all events, the argument would be good. What happens if the revenues from the facility fail as a sustaining support, let alone what would happen in the exercise of the police power to abolish the entire project? The nonuser of the facility would already have been deprived of funds extracted from the general treasury that would have to be replaced by other forms of taxation by which he would be affected. I think it can be said with great force that the voter who voted in

favor of the question as here submitted, did so upon the combined terms and conditions expressed in the question. The judgment should be reversed.